[No. 52928–1. En Banc. October 22, 1987.]

*In the Matter of the Personal Restraint of*
RODOLFO MENDOZA MONTOYA.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Howard W. Hansen, Deputy,* for petitioner.

*Helen A. Anderson* of *Washington Appellate Defender Association,* for respondent.

DURHAM, J.—Defendant Rodolfo Mendoza Montoya brought a personal restraint petition in the Court of Appeals, challenging the validity of his guilty plea to first degree manslaughter. The Court of Appeals decided the plea was invalid and granted the petition. We reverse, holding that Montoya's guilty plea was constitutionally valid.

This case arises out of an incident that occurred late in the evening of April 16, 1983, outside of the Spur Tavern in Harrah, Washington, when Jose Anguiano was stabbed in the chest with a knife. Anguiano died as a result of the stabbing.

On April 20, 1983, the Yakima County Prosecuting Attorney charged Montoya with second degree murder of Anguiano under RCW 9A.32.050(1)(a).[1] The charge included a deadly weapon allegation under RCW 9.95.040. Subsequently, a plea bargain was negotiated under which,

---

[1]RCW 9A.32.050(1)(a) provides:

"A person is guilty of murder in the second degree when:

"(a) With intent to cause the death of another person but without premeditation, he causes the death of such person or of a third person".

in return for a reduction of the charge to first degree manslaughter and the elimination of the deadly weapon allegation, Montoya would plead guilty to the lesser charge and waive the presentence investigation.

On July 20, 1983, the prosecuting attorney filed an amended information which charged Montoya with first degree manslaughter under RCW 9A.32.060(1)(a) and stated that the maximum penalty was 10 years and/or $20,000.[2] The amended information further stated that Montoya

> did stab Jose P. Anguiano with a knife, while said Jose P. Anguiano was attempting to stop a fight between the defendant and a third person, thereby recklessly causing the death of Jose P. Anguiano, a human being, on or about April 16, 1983.

On the day the amended information was filed, the parties appeared in superior court to present the plea agreement. An interpreter was present to translate for Montoya, who does not speak English. The court was presented with the amended information and a statement on plea of guilty signed by Montoya.

The statement on plea of guilty said that Montoya had been informed by the court that he was charged with first degree manslaughter, the maximum sentence for which was 10 years and/or $20,000. It further stated that Montoya pleaded guilty to this crime as charged in the amended information, and that he had received a copy of the amended information. The form also said that the court had asked the defendant to state briefly in his own words what he did that resulted in his being charged with the crime in the information. This statement followed:

> Newton Plea—Defendant cannot remember the events involved in the crime. Defendant realizes the prosecution could highly likely convict him at trial of 2° murder, and

---

[2]RCW 9A.32.060(1)(a) provides:

"A person is guilty of manslaughter in the first degree when:

"(a) He recklessly causes the death of another person".

for that reason wishes to plead to the lesser crime of 1° manslaughter.

Montoya's attorney told the court that the statement on plea of guilty had been translated "word for word" to Montoya and that counsel had explained it to him. The court asked Montoya if he and his attorney had discussed the form and if Montoya had signed it after that discussion, and Montoya responded affirmatively to these questions through his interpreter.

The court then told Montoya that it had been advised by the prosecutor that in return for a reduction of the charge from second degree murder to first degree manslaughter, Montoya would plead guilty to the amended charge. The court asked Montoya if he had discussed that with his lawyer, and Montoya said he had. The court told Montoya that he was now charged with first degree manslaughter and informed him of the maximum penalty for that crime. It asked Montoya if he understood that this was the charge, and Montoya responded affirmatively. The court told Montoya that he had a number of rights which were listed on the form he had signed, and that if he entered a guilty plea, he gave up those rights. The court asked him if he understood that and he said he did. The court then informed Montoya specifically of each of these rights, asked him if he understood them, and he responded affirmatively. The court then stated, "Knowing that these valuable rights are given up if you enter a guilty plea, is that still what you wish to do?" Montoya responded, "Yes. Yes, for my family's sake and for everybody else, yes."

Subsequently, the prosecuting attorney told the court that the amended information had been provided to Montoya and his counsel, and that it had been read to Montoya in Spanish. Defense counsel also stated that the interpreter had read the amended information to Montoya in Spanish, "word by word". The court asked Montoya if the charge had been read to him and Montoya stated that it had.

Both attorneys then indicated to the court that Montoya did not remember what happened during the incident

because he had been drinking beforehand, and because he had lost a lot of blood due to an injury he had received that evening. The court then told Montoya that it had asked the attorneys if he understood his rights and understood the attorneys' discussions with him. It asked Montoya if he disagreed with anything that the attorneys had said to the court. Montoya said he did not. The following exchange then took place:

THE COURT: I will ask you, Mr. Montoya, then, formally, to the charge as it now exists in the amended information; that is, the charge of first degree manslaughter, how do you plead, guilty or not guilty?

MR. MONTOYA: (Through the interpreter.) I have—I'm not sure because I—I don't know just what happened. I'm not sure whether I can say this or not.

THE COURT: Okay. Mr. Montoya, I will—my understanding is that that was the case, that your plea would be that you do not remember.

I'll read to you from what's on this form. And it says, "Newton plea," which doesn't mean anything to you, I assume.

But it then says, "Defendant cannot remember the events involved in the crime. Defendant realizes the prosecution could highly likely convict him at trial of second degree murder, and for that reason wishes to plead to the lesser crime of first degree manslaughter."

Is that what—

MR. MONTOYA: (Through the interpreter.) That's the way it is.

THE COURT: (Continuing)—you're telling me, mister—

MR. MONTOYA: (Through the interpreter.) Yes.

The court then stated that it had read what had been admitted into evidence by the prosecution. The court asked if counsel wished to add to that. The prosecuting attorney then presented the court with an oral summary of the State's evidence, as follows:

MR. HANSEN: Thank you. This incident happened in the late evening hours of April 16, 1983, at the Spur Tavern in Harrah, Washington. It's in Yakima County.

At that time Mr. Montoya along with a Mr. Manjarrez, a Johnny Hernandez and the decedent, Jose Anguiano,

were all inside that tavern. There was a dance going in the back. They were seated at the bar toward the front. Mr. Anguiano and the defendant, Mr. Montoya, were having a rather heated discussion. Mr. Hernandez who was in the back at that time—he was not seated with the other three at that point in time—came to the front when he saw this going on. He pushed Mr. Montoya off his bar stool. And there's conflicting evidence, but it appears he produced a knife at that time in a threatening manner toward Mr. Montoya.

The bartender then forced Mr. Montoya and Mr. Manjarrez to leave the tavern as he believed they were the individuals that started the problem there at that time. They had all been drinking.

Mr. Montoya then, the testimony would be, while being outside the tavern, basically, called Johnny Hernandez out, the individual that had the dispute with him inside, the altercation.

Initially, other individuals in the tavern held Mr. Hernandez back and told him not to go outside. That will be the testimony of Steven Ripley, the bartender, Mr. William Walter Hyde, Ron Purdy and Larry Harvey. They would all indicate that was basically the situation.

The decedent, Jose Anguiano, was also inside. Mr. Anguiano's an elderly man, very peaceable man and, basically, everybody's friend, that was involved in this or at least everybody assumed that. At some point Mr. Montoya prompted Mr. Hernandez to come out—There was a discussion between the two, anyway. He came outside to accept the challenge. At this point the knives were produced and a knife fight proceeded between Mr. Montoya and Mr. Johnny Hernandez in which both individuals received wounds. Mr. Manjarrez who was outside with Mr. Montoya left the scene as soon as he realized that a knife fight was going on.

He tried to talk the defendant out of doing that, but, apparently, the passions were such that that could not happen.

As the knife fight was proceeding out in the street, Mr. Anguiano by everyone's testimony tried to get the two men to stop fighting. He had no weapon; he's a peaceable man. Everybody that knew him said that he's never been known to have a weapon, and he was clearly trying to stop something very bad that was going on.

The testimony of Ron Purdy and Larry Harvey and Johnny Hernandez would be that at one point in the fight Johnny Hernandez was knocked to the ground by the defendant. At that point, Mr. Anguiano, the victim in this case, was close by trying to get them to stop. As soon as Johnny Hernandez was knocked to the ground, all would testify that the defendant at that point in time turned to Jose Anguiano and approached him. At the point that Jose realized that he was about to be attacked, he raised his arms, and he said, "I have no knife."

At that point in time all individuals would state that Mr. Montoya then stabbed Mr. Anguiano in the chest, one blow. At that point in time, the decedent fell to the ground.

The defendant's wife who was in a car nearby backed up, drove out to the intersection where this was occurring, picked him up, he getting in the passenger's side, and drove him to their home.

There is the testimony of another individual, a Harold Sharp who had heard this commotion and lives down the street and came outside as he observed the fight from a long distance away. But he knew the decedent very well and he indicated that he clearly observed that at the time of the stabbing of Mr. Anguiano that Mr. Anguiano did have his hands up; and he turned and he heard him yell to the effect that he was not armed; and saw him drop to the ground. As he ran to him, Mr. Anguiano was, basically, dying when he arrived there. Although he could not identify this individual, there is another individual that will testify as to the way Mr. Anguiano died. Mr. Montoya was later picked up at his house by police officers. At that time, he was badly injured and he still had his knife in his hand at that time. He was taken to the hospital as was Johnny Hernandez, both of them having received serious wounds. They were both hospitalized for some period of time.

The pathologist's report indicates that the decedent, Jose P. Anguiano, received one stab wound to the chest that pierced his heart which caused cardiac arrest and it was his cause of death; that is to say, from the stab wound to the heart.

After the prosecutor finished this summary, the court asked defense counsel if there was anything he would like to add, and he responded that there was not. The court

then stated that it had read the reports, was satisfied that there was an adequate factual basis for Montoya to plead guilty to first degree manslaughter, and accepted the plea. It sentenced Montoya to a maximum term of 10 years and entered a judgment accordingly.

In September 1985, Montoya filed a personal restraint petition in the Court of Appeals. In an unpublished opinion, the Court of Appeals granted Montoya's petition, holding that his guilty plea was invalid because it was not entered knowingly, intelligently, or voluntarily. The Court of Appeals specifically decided that Montoya had not been informed of the elements of first degree manslaughter or of the burden of proof on self-defense, and that the trial court had not clarified or eliminated an equivocation expressed by Montoya at the plea hearing. The Court of Appeals vacated Montoya's plea and remanded the case for a trial on the second degree murder charge. This court granted the State's motion for discretionary review.

In order to obtain relief, a personal restraint petitioner has the burden of showing that actual prejudice resulted from the alleged error raised in the petition. A constitutionally invalid guilty plea gives rise to actual prejudice. *In re Hews*, 99 Wn.2d 80, 87–88, 660 P.2d 263 (1983) (*Hews* I). The State contends that Montoya's plea was constitutionally valid and, therefore, the Court of Appeals improperly granted him relief.

Due process requires that a guilty plea be knowing, intelligent and voluntary. *In re Hews*, 108 Wn.2d 579, 590, 741 P.2d 983 (1987) (*Hews* II); *Henderson v. Morgan*, 426 U.S. 637, 644–45, 49 L. Ed. 2d 108, 96 S. Ct. 2253 (1976). Montoya entered the type of plea that is authorized by *North Carolina v. Alford*, 400 U.S. 25, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970) and *State v. Newton*, 87 Wn.2d 363, 552 P.2d 682 (1976). Under these cases, a defendant may voluntarily, knowingly, and intelligently plead guilty even if he is unable or unwilling to admit that he participated in the acts constituting the crime. *North Carolina v. Alford, supra* at 37. When a defendant makes an *Alford* plea, the trial

court must exercise extreme care to ensure that the plea satisfies constitutional requirements. *See State v. Newton, supra* at 373.

The first issue we must address is if Montoya's guilty plea was invalid on the grounds that he was not adequately informed of the nature of the charge against him. In order for a guilty plea to be accepted as knowing, intelligent and voluntary, the accused must be apprised of the nature of the charge. *Henderson v. Morgan, supra* at 645; *Hews* II, at 590; *State v. Osborne,* 102 Wn.2d 87, 92–93, 684 P.2d 683 (1984); *In re Keene,* 95 Wn.2d 203, 207, 622 P.2d 360 (1980). At a minimum, "the defendant would need to be aware of the acts and the requisite state of mind in which they must be performed to constitute a crime." *In re Keene, supra* at 207 (quoting *State v. Holsworth,* 93 Wn.2d 148, 153 n.3, 607 P.2d 845 (1980)); *State v. Osborne, supra* at 93; *Hews* I, at 87.

 Montoya argues that he did not receive notice of the elements of the crime charged. The record indicates, however, that Montoya was made aware of the acts and the state of mind constituting the crime. The amended information stated that Montoya:

> did stab Jose P. Anguiano with a knife, while said Jose P. Anguiano was attempting to stop a fight between the defendant and a third person, thereby recklessly causing the death of Jose P. Anguiano, a human being, on or about April 16, 1983.

This statement clearly includes the acts and state of mind necessary to constitute first degree manslaughter. *See* RCW 9A.32.060(1)(a). Montoya's attorney told the trial court that the interpreter had translated the amended information to Montoya "word by word", and Montoya acknowledged to the trial court that it had been read to him. We conclude that because Montoya knew the contents of the amended information, which described the acts and state of mind constituting the crime charged, he was given adequate notice of the elements of the crime. Similarly, in *Keene,* at 208–09, we held that the defendant had notice of the state

of mind required for forgery where it was specified in the information and the defendant had acknowledged receiving a copy of the information. *See also State v. Osborne, supra* at 94 (defendants were made sufficiently aware that knowledge was an element of the offense where the information, which was read to them at the plea hearing, clearly indicated that knowing conduct was contemplated).[3]

Montoya also contends that he was not adequately apprised of the nature of the charge because he was never informed of the burden of proof on the issue of self–defense. Self–defense, however, becomes an issue only if the defendant raises the defense and presents some credible evidence to support it. *See State v. McCullum,* 98 Wn.2d 484, 488, 656 P.2d 1064 (1983); *State v. Roberts,* 88 Wn.2d 337, 346, 562 P.2d 1259 (1977).

Montoya argues that evidence in the police reports which the State presented to the trial court supports a claim of self–defense. He notes that the victim, Anguiano, had started a discussion with Montoya in the tavern on the evening of the incident; that Hernandez, who had knocked Montoya from a bar stool and threatened Montoya with a knife, was with Anguiano; and that after Montoya and Hernandez became involved in the knife fight, Montoya turned and stabbed Anguiano as Anguiano approached him. In addition, Montoya told the police that although he could not remember exactly what happened after they left the tavern, he was defending himself. None of these asser-

---

[3]The Court of Appeals concluded that the record did not show that Montoya was informed of the elements of first degree manslaughter. This conclusion can be explained by the fact that the amended information apparently was not included in the record before the Court of Appeals. As the prosecuting attorney explained to this court, the State had little reason to provide the amended information to the Court of Appeals because this portion of the record was not relevant to the issue raised in Montoya's personal restraint petition filed in that court. In that pro se petition, Montoya alleged that the interpreter misrepresented the contents of the statement on plea of guilty, tricked him into signing it, and was related to Mr. Hernandez, the third individual involved in the knife fight. Like the Court of Appeals, we note that nothing in the record supports Montoya's allegations regarding the independence or validity of the interpreter's translations.

tions, however, are adequate to support a plausible claim of self-defense. There is no evidence that Anguiano, who was unarmed at the time of the stabbing, engaged in any threatening behavior which would make a credible self-defense claim available to Montoya. *See* RCW 9A.16.050. Montoya's bare assertion that he was defending himself is unpersuasive given that he was unable to remember exactly what happened.

In sum, we conclude that there is no potential evidence that would support a claim of self-defense in this case. The trial court certainly had no obligation to inform Montoya of the burden of proof on a purely hypothetical claim. *See Commonwealth v. White,* 295 Pa. Super. 13, 440 A.2d 1198 (1982) (court's failure to advise defendant of all possible defenses does not per se render a plea invalid; court need not inform defendant of a particular defense where there is no evidence to support it). *See also United States v. Frye,* 738 F.2d 196, 199 (7th Cir. 1984) ("before pleading guilty a defendant should be made aware of possible defenses, at least where the defendant makes known facts that might form the basis of such defenses"). Therefore, the trial court did not err by not informing Montoya of the burden of proof on self-defense.

Montoya further contends that his guilty plea was invalid because it was equivocal and the trial court failed to eliminate the equivocation. An *Alford* plea is inherently equivocal in the sense that the defendant pleads guilty without admitting guilt. This alone, however, does not render an otherwise voluntary and intelligent guilty plea invalid. *North Carolina v. Alford, supra* at 37; *Hews* II, at 591. The basic standard for determining the validity of an *Alford* plea is whether it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford, supra* at 31. If a defendant "intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt", such a plea

is valid. *North Carolina v. Alford, supra* at 37.

Montoya's argument focuses on the following exchange between the trial court and Montoya:

> THE COURT: I will ask you, Mr. Montoya, then, formally, to the charge as it now exists in the amended information; that is, the charge of first degree manslaughter, how do you plead, guilty or not guilty?
>
> MR. MONTOYA: (Through the interpreter.) I have—I'm not sure because I—I don't know just what happened. I'm not sure whether I can say this or not.

Montoya's response may suggest that he was confused about whether a guilty plea was appropriate, given that he could not remember what occurred during the stabbing incident. Arguably, this indicates some misunderstanding of what an *Alford* plea entails. However, the record indicates that the trial court clarified the situation so as to eliminate any confusion on Montoya's part. Immediately after the exchange quoted above, the trial court told Montoya that it understood that he did not remember. It then read Montoya's statement in the plea form to him, which said that although he could not remember the events involved, he realized that it was highly likely that he could be convicted at trial of second degree murder, and for that reason he wished to plead guilty to the lesser crime of first degree manslaughter. Montoya responded, "That's the way it is." This indicates that Montoya in fact decided that pleading guilty to manslaughter was a preferable alternative to going to trial on the higher charge. In other words, Montoya entered an *Alford* plea with an understanding of its significance.[4]

---

[4]Montoya also argues that, given that he did not remember the incident, his plea could not have been knowing, voluntary and intelligent unless the police reports themselves were read to him in their entirety. He suggests that the prosecutor's summary of the potential evidence during the plea hearing did not adequately inform him of the facts and alert him to possible defenses. However, the defendant need not be informed of every detail of evidence gathered by the State in order to make a knowing, voluntary and intelligent *Alford* plea. The prosecutor's summary of the facts during the plea hearing accurately reflected the evidence in the police reports that the State would have presented at trial to prove

In summary, the record establishes that Montoya's guilty plea was knowing, intelligent and voluntary. He was informed of the nature of the crime charged, and his decision to plead guilty to first degree manslaughter was a knowing, voluntary and intelligent choice among alternatives. In addition, there was a strong factual basis for the plea. Therefore, the plea was constitutionally valid.

Because Montoya has failed to show any error resulting in actual prejudice, we conclude that there is no basis for granting him relief. We reverse the Court of Appeals vacation of his guilty plea and reinstate the trial court's judgment.

UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, CALLOW, and GOODLOE, JJ., and SKIMAS, J. Pro Tem., concur.

---

the elements of the crime. Under these circumstances, Montoya's lack of knowledge of the entire contents of the police reports did not prevent him from making an informed decision that, due to the likelihood of conviction if the case went to trial, it was in his interest to plead guilty. In addition, Montoya has not argued that his attorney did not read the police reports. If the reports had contained any statements that might have suggested possible defenses, defense counsel would have been aware of them.