981 P.2d 426 (1999)
138 Wash.2d 830
In the Matter of the DISCIPLINARY PROCEEDINGS AGAINST The Honorable Grant L. ANDERSON,
No. JD NO. 14.
Supreme Court of Washington, En Banc.
Argued February 9, 1999.
Decided July 29, 1999.
As Amended August 12, 1999.
Reconsideration Denied September 2, 1999.
*427 Byrnes & Keller, Paul R. Taylor, Seattle, for the Commission.
Kurt Bulmer, Seattle, for Anderson.
MADSEN, J.
Pierce County Superior Court Judge Grant L. Anderson challenges a determination by the Commission on Judicial Conduct (Commission) that his extra-judicial activities relating to a deceased client's estate violated the Canons of the Code of Judicial Conduct. The Commission ordered that Judge Anderson be censured and recommended suspension for four months without pay. Additionally, the Commission ordered Judge Anderson to attend a judicial ethics course and ordered him to amend filings with the Public Disclosure Commission as a "course of corrective action." Commission Decision at 9. We agree that Judge Anderson's conduct violated the Canons, however, we believe that removal from office is the proper sanction. Accordingly, we order his removal and vacate the Commission's order of corrective action.

FACTS
From 1977 to 1992, Judge Anderson was a municipal court judge for the City of Fircrest in Pierce County. During that time, Judge Anderson was also in private practice. In connection with his practice, Judge Anderson drafted the will of Charles Hoffman, his longtime client. Mr. Hoffman's will designated Judge Anderson as personal representative of his estate upon his death. In 1989, Mr. Hoffman died and Judge Anderson assumed the responsibility of personal representative of the estate.
The estate included three business corporations: (1) Hoffman-Stevenson, Inc., which owned the real estate and building housing a bowling alley operation in Tacoma, Washington; (2) Pacific Lanes, Inc., which operated the bowling alley and leased the real property from Hoffman-Stevenson, Inc.; and (3) Surfside Inn, Inc. Judge Anderson installed himself as president of the three companies.
On January 8, 1993, Judge Anderson was sworn in as Pierce County Superior Court Judge. Judge Anderson continued to serve as president of the estate's corporations and continued to participate in the estate's business until mid-October 1993. The Code of Judicial Conduct (CJC) require judges to regulate their extra-judicial activities to minimize the risk of conflict with their judicial duties and, thus, strongly discourage judges from serving as officers or otherwise working on behalf of any business. CJC 5(C)(3).
*428 Judge Anderson's continued involvement with the estate's business corporations led to allegations that he violated Canons 1, 2(A), 5(C)(3) and 6(C). The Judicial Conduct Commission conducted a five-day fact-finding hearing based on complaints to the Commission. The hearing focused on the circumstances and facts surrounding three events: the sale of the bowling alley business; Judge Anderson's acceptance of car loan payments from 1993 to 1995; and Judge Anderson's continued role as president of three corporations for 10 months after he was sworn-in as Pierce County Superior Court Judge.
Sale of the bowling alley business Judge Anderson testified that sometime in April 1992, he approached his friend William Hamilton, a Tacoma area banker and investor, about selling the estate's bowling alley business. The two were good friends who often talked about business ventures. Judge Anderson believed that due to various problems with the building, such as asbestos and poor sewage, marketing the sale of the bowling alley business would be difficult. Moreover, Judge Anderson thought it would be too complicated to sell the business through conventional financing arrangements, so he approached Mr. Hamilton, who expressed interest in buying the bowling alley.
In August 1992, Judge Anderson and Mr. Hamilton reviewed the first draft of the Business Acquisition and Lease Agreement. This first draft had handwritten notes indicating what appear to be revisions, such as changes to the closing date from September 30, 1992 to September 1, 1992. The parties did not sign the document.
On August 26, 1992, Judge Anderson and Mr. Hamilton reviewed a second draft of the Business Acquisition and Lease Agreement. This document appeared to reflect changes from the first draft, such as the closing date of September 1, 1992. Judge Anderson and Mr. Hamilton both signed this second draft. On September 19, 1992, a third and final draft of the Business Acquisition and Lease Agreement was reviewed and signed by both Judge Anderson and Mr. Hamilton. This last draft of the agreement was modified to reflect additional changes. Specifically, the document provided that closing would occur after certain conditions were met, such as receipt of state and local gambling and liquor permits. Additionally, the final agreement provided that the purchaser of the bowling alley would be Pacific Recreation Enterprises, Inc., of which Mr. Hamilton was the sole shareholder and president.
Although the last Business Acquisition and Lease Agreement signed by Judge Anderson and Mr. Hamilton included an open-ended closing date, Anderson and Hamilton both testified that they actually intended the closing date to be September 1, 1992. In order to reflect the delay in closing, Judge Anderson testified that he and Mr. Hamilton anticipated that an adjustment to the sale price would be necessary and that both he and Mr. Hamilton understood the sale to be contingent upon Mr. Hamilton's receiving cash flows from the bowling alley during its fall season. Judge Anderson further testified that after September 1, 1992, he basically had nothing to do with the business or management of the bowling alley.
Judge Anderson continued to conduct business on behalf of Pacific Lanes, Inc.; however, and on September 28, 1992, he submitted applications for a gambling permit[1] and liquor license transfer[2] which were contingencies of the Business Acquisition and Lease Agreement.
On October 28, 1992, Judge Anderson responded by letter to the Washington State Gambling Commission's inquiry about his authority to operate on behalf of the Hoffman estate. In that letter, Judge Anderson refers to the "pending sale of Pacific Lanes [Inc.]" Ex. 2.
On December 4, 1992, Judge Anderson and Mr. Hamilton completed a bill of sale for the bowling alley business in the amount of *429 $300,000.[3] Supporting documents included a purchaser's closing statement showing a cash payment of $50,000 signed by Mr. Hamilton on behalf of Pacific Recreation Enterprises, Inc., and a promissory note in the amount of $250,000.
On December 9, 1992, Judge Anderson, as president of Pacific Lanes, Inc., signed a security agreement with First Interstate for the promissory note in the amount of $250,000.
On or about the first week of January 1993, the Hoffman estate was closed and its assets, including the stock of Hoffman-Stevenson, Inc. and Pacific Lanes, Inc., were transferred to a trust. Mr. Fisher, Judge Anderson's former law partner, was appointed trustee.
On March 9, 1993, Mr. Fisher held a meeting at his office with Judge Anderson, Mr. Hamilton and his accountant, Mr. Iverson. At this meeting, Mr. Fisher, Judge Anderson, Mr. Hamilton, and Mr. Iverson reviewed a document, prepared by Mr. Iverson, stating that Mr. Hamilton's company "REALLY TOOK POSSESSION JANUARY 1, 1993." Ex. 61. The document, entitled "PACIFIC LANES PURCHASE PRICE ADJUSTMENTS PER DISCUSSIONS WITH GRANT ANDERSON AND BILL HAMILTON," also states a purchase price reduction of $92,829, resulting in a change from the original purchase price of $300,000 to the adjusted purchase price of $207,171. Id.
According to Mr. Fisher, the March 1993 meeting was very important because, as trustee, he had to make a final decision about the actual closing date and possible adjustment in purchase price. Mr. Fisher did not know the details of the original agreement between Judge Anderson and Mr. Hamilton, and did not know until late January 1993 that there was any agreement between Judge Anderson and Mr. Hamilton to adjust the purchase price of the bowling alley. As a result, in deciding to make a purchase price adjustment for the bowling alley, Mr. Fisher relied on Judge Anderson, Mr. Hamilton, and Mr. Iverson for information about the nature of the transaction in September 1992.
In October 1993, Mr. Hamilton, through Pacific Recreation Enterprises, Inc., purchased the land and buildings on which the bowling alley was located. Judge Anderson, as president of both Pacific Lanes, Inc., and Hoffman-Stevenson, Inc., executed the various closing documents, such as the Statutory Warranty Deed, Termination of Lease document, and Real Estate Excise Tax Affidavit.
Acceptance of the car loan payments
On December 24, 1992, Judge Anderson purchased a Cadillac El Dorado. Judge Anderson took out a loan from Sound Bank in Tacoma in which he and Mr. Hamilton were shareholders.
On January 5, 1993, the car dealership delivered the car to Judge Anderson. Diane Anderson, who was married to Judge Anderson at the time, testified that she was surprised when he came home with the new Cadillac. According to Ms. Anderson, sometime after Judge Anderson came home with the car they discussed how the car payments would be made. Ms. Anderson recalled that Judge Anderson told her he had just sold the bowling alley, and that the Cadillac was a commission similar to what a realtor would receive. She testified that Judge Anderson told her Mr. Hamilton was making the payments on the car.
On or about January 8, 1993, the day he was sworn in as Superior Court Judge, Mr. Hamilton made arrangements to pay for Judge Anderson's car loan. Mr. Hamilton testified that he made the offer when Judge Anderson came into his bank to make a payment of $9,000 on the car loan. Mr. Hamilton and Judge Anderson met in Mr. Hamilton's office at the bank. According to Mr. Hamilton, they happened to discuss Judge Anderson's new Cadillac. Mr. Hamilton testified that Judge Anderson brought up the fact that the car loan was a financial obligation he took seriously. Mr. Hamilton testified:
And so it reminded me at that time that, my gosh, I had never ever gotten a bill *430 from him ever for 15 years' worth of services.... It was that kind of a relationship. We were friends. He's as good a male friend as I have.
And so I remember saying, gosh, I felt kind of cheap at that time, because attorneys cost a lot of money. I've spent a lot of money on attorneys, and I'd never spent a dime for the advice and counsel and friendship that I had gotten from Grant.
. . . .
So I said, "Let me pay you something for your services," and that's how that came about. I couldn't just walk up to him and say, "Here." That would humiliate him. He didn't want anything. He wasn't in a position to take anything, he explained to me. And I said, "Well, you can take a gift. I can give you a gift, can I not?" and he said, "Yes."
So to make it palatable to him in my mind, I said, well, you know, I'm not just going to hand him a check or hand him some cash or something of that nature. That would have not been socially acceptable to him, so let's make it something that he can live with.
And it was $800, is the way I looked at it. It was $800 a month, and I said, "Let me make some payments on your Cadillac."
Verbatim Report of Proceedings (RP) at 260-62.
According to Judge Anderson, he initially declined Mr. Hamilton's offer of the car loan payments, but stated that Mr. Hamilton insisted. "And as he was a friend, I don't know quite how to explain this, but say it would almost have been an affront to him to say, `I just absolutely will not,' he became that insistent, and so I said okay." RP at 630-31. Judge Anderson and Mr. Hamilton did not discuss how much or how long the monthly payments would continue.
Between January 1993 and May 1995, Mr. Hamilton made monthly payments on Judge Anderson's Cadillac, totaling $31,185, out of the business account of his company Pacific Recreation Enterprises, Inc. The payments were treated as an expense on the accounting books of Pacific Recreation Enterprises, Inc., and deducted as an expense on the company's tax returns. Although Mr. Hamilton testified that he was accustomed to giving monetary gifts, his monthly payments on Judge Anderson's Cadillac was the only gift he ever documented as a business expense, deductible on his company's tax returns.
Judge Anderson testified that he did not disclose the car loan payments to Mr. Fisher, trustee for the estate, and did not indicate the receipt of car loan payments on his filings with the Public Disclosure Commission because he understood the car loan payments to be a gift.
Judge continuing to serve as president of estate's corporations
In mid-October 1993, after Mr. Hamilton purchased the land and buildings on which the bowling alley was located, Judge Anderson resigned as president of Hoffman-Stevenson, Inc., Pacific Lanes, Inc., and Surfside Inn, Inc.
Testimony by both Judge Anderson and Mr. Fisher, the trustee of the Hoffman estate, indicated that the late resignation was a mere oversight on the part of one of the lawyers in Mr. Fisher's law firm. Other testimony by Judge Anderson himself, and the trustee, indicated, however, that Judge Anderson was asked to stay on as president after January 1993 to wrap-up his work on the Hoffman estate. According to Mr. Fisher, it was not until March 1993, that he requested his law firm take steps to remove Judge Anderson as president of the estate's corporations.
Judge Anderson explained that Mr. Fisher asked him to stay on as president of the estate's corporations for the first few months after he was sworn in as Superior Court Judge. Judge Anderson testified that he agreed because he believed the Code of Judicial Conduct allowed a judge a reasonable amount of time to wrap-up work on estates. As for the additional seven months, in 1993, Judge Anderson and Mr. Fisher testified that Judge Anderson's participation in the transactions after March was limited to signing documents as president of Hoffman-Stevenson, Inc. and Pacific Lanes, Inc.
On August 4, 1997, the Commission filed a Statement of Charges against Judge Anderson, alleging seven violations of Canons 1, 2(A), 5(C)(3), and 6(C) of the Code of *431 Judicial Conduct. The alleged actions were based on Judge Anderson's role as personal representative of a deceased client's estate, subsequent transactions he engaged in as president of two companies belonging to the estate, and acceptance of three years' worth of loan payments for his car. Judge Anderson contested the charges.
The Commission held a five-day fact-finding hearing from January 12 to January 16, 1998. On April 3, 1998, the Commission filed its decision, dismissing four of the charges but concluding that Judge Anderson committed violations of Canons 1, 2(A), 5(C)(3), and 6(C) by: (1) continuing to serve as president of the estate's corporations through October 1993; (2) accepting car loan payments from Mr. Hamilton while simultaneously negotiating a price reduction of $92,829 for the bowling alley business purchased by Mr. Hamilton's company; and (3) failing to report his receipt of the car payments on his public disclosure filings for 1993, 1994 and 1995. Commission Decision at 4-7. The Commission censured Judge Anderson and recommended suspension for four months without pay. The Commission also ordered Judge Anderson to take a "course of corrective action" by attending a Commission-approved course on Judicial Ethics and amending his filings with the Public Disclosure Commission to reflect payments on the Cadillac made by Mr. Hamilton. Commission Decision at 9.
Counsel for the Commission moved for reconsideration, urging the Commission to change its suspension recommendation to removal of Judge Anderson. Judge Anderson responded, and also moved for reconsideration on the issue of the Commission's authority to order a corrective course of action in addition to the censure and recommended suspension. On May 1, 1998, the Commission denied both motions. Pursuant to Discipline Rules for Judges (DRJ) 2(a) and Commission on Judicial Conduct Rules of Procedure (CJCRP) 25(b), the Commission filed its decision with this court, on May 15, 1998. Judge Anderson filed a timely Notice of Contest.

ANALYSIS
The Washington Constitution sets forth the procedure to be followed in the case of judicial discipline. Const. art. IV, § 31 (amend. 85).
COMMISSION ON JUDICIAL CONDUCT.
(1) There shall be a commission on judicial conduct, existing as an independent agency of the judicial branch, and consisting of a judge selected by and from the court of appeals judges, a judge selected by and from the superior court judges, a judge selected by and from the district court judges, two persons admitted to the practice of law in this state selected by the state bar association, and six persons who are not attorneys appointed by the governor.
(2) Whenever the commission receives a complaint against a judge or justice, or otherwise has reason to believe that a judge or justice should be admonished, reprimanded, censured, suspended, removed, or retired, the commission shall first investigate the complaint or belief and then conduct initial proceedings for the purpose of determining whether probable cause exists for conducting a public hearing or hearings to deal with the complaint or belief. The investigation and initial proceedings shall be confidential. Upon beginning an initial proceeding, the commission shall notify the judge or justice of the existence of and basis for the initial proceeding.
(3) Whenever the commission concludes, based on an initial proceeding, that there is probable cause to believe that a judge or justice has violated a rule of judicial conduct or that the judge or justice suffers from a disability which is permanent or likely to become permanent and which seriously interferes with the performance of judicial duties, the commission shall conduct a public hearing or hearings and shall make public all those records of the initial proceeding that provide the basis for its conclusion. If the commission concludes that there is not probable cause, it shall notify the judge or justice of its conclusion.
(4) Upon the completion of the hearing or hearings, the commission in open session shall either dismiss the case, or shall admonish, reprimand, or censure the judge or justice, or shall censure the judge or justice and recommend to the supreme court the suspension or removal of the judge or justice, or shall recommend to the supreme court the retirement of the judge *432 or justice. The commission may not recommend suspension or removal unless it censures the judge or justice for the violation serving as the basis for the recommendation. The commission may recommend retirement of a judge or justice for a disability which is permanent or likely to become permanent and which seriously interferes with the performance of judicial duties.
(5) Upon the recommendation of the commission, the supreme court may suspend, remove, or retire a judge or justice. The office of a judge or justice retired or removed by the supreme court becomes vacant, and that person is ineligible for judicial office until eligibility is reinstated by the supreme court. The salary of a removed judge or justice shall cease. The supreme court shall specify the effect upon salary when it suspends a judge or justice. The supreme court may not suspend, remove, or retire a judge or justice until the commission, after notice and hearing, recommends that action be taken, and the supreme court conducts a hearing, after notice, to review commission proceedings and findings against the judge or justice.
(6) Within thirty days after the commission admonishes, reprimands, or censures a judge or justice, the judge or justice shall have a right of appeal de novo to the supreme court.
(7) Any matter before the commission or supreme court may be disposed of by a stipulation entered into in a public proceeding. The stipulation shall be signed by the judge or justice and the commission or court. The stipulation may impose any terms and conditions deemed appropriate by the commission or court. A stipulation shall set forth all material facts relating to the proceeding and the conduct of the judge or justice.
(8) Whenever the commission adopts a recommendation that a judge or justice be removed, the judge or justice shall be suspended immediately, with salary, from his or her judicial position until a final determination is made by the supreme court.
Const. art. IV, § 31 (amend. 85).
This Court reviews judicial disciplinary proceedings de novo. In re Disciplinary Proceeding Against Deming, 108 Wash.2d 82, 87-89, 736 P.2d 639, 744 P.2d 340 (1987). De novo review of judicial disciplinary proceedings requires an independent evaluation of the record as the Court is not bound by the Commission's findings or conclusions. In re Disciplinary Proceedings Against Turco, 137 Wash.2d 227, 246, 970 P.2d 731 (1999). De novo review does not mean that the Supreme Court conducts a new evidentiary hearing. Rather, this Court must independently determine if the judge violated the Code of Judicial Conduct; and, if so, the proper sanction to be imposed. Id. The Commission bears the burden of proving factual findings by clear, cogent, and convincing evidence. Id. In evaluating the evidence, we necessarily give considerable weight to credibility determinations by the Commission, as the body that had the opportunity directly to observe the witnesses and their demeanor. Id. Additionally, we give serious consideration to the Commission's recommended sanctions. In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 870 P.2d 967 (1994). Nevertheless, the Commission's recommendation is just that. The constitution's use of the word "recommend" indicates an intent to place the ultimate decision to discipline in the Supreme Court. Deming, 108 Wash.2d at 88, 736 P.2d 639.

VIOLATIONS
1. Acceptance of car loan payments and the negotiation of sale price reduction for bowling alley business.
Judge Anderson was charged with violation of Canon 1 and Canon 2(A) based on his conduct surrounding the sale of the bowling alley business, Pacific Lanes, Inc., and his receipt of car loan payments during the negotiations surrounding that sale.
Canon 1 provides:
An independent and honorable judiciary is indispensable to justice in our society. Judges should participate in establishing, maintaining, and enforcing high standards of judicial conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code are to be construed and applied to further that objective.
Canon 2(A) reads that:

*433 Judges should respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
See also 1998 Annual Report of the State of Washington Commission on Judicial Conduct "Code of Judicial Conduct" app. D at 37. In this case, the Commission found in conclusion 5 that:
Judge Anderson violated Canons 1 and 2(A) of the Code of Judicial Conduct by accepting an offer from William Hamilton to have his car loan payments made by William Hamilton during the same time Judge Anderson and William Hamilton negotiated a reduction of $92,829 in the amount owed by Hamilton's company, Pacific Recreation Enterprises, Inc., to Pacific Lanes, Inc..... The result of Judge Anderson's actions, in accepting the payments from William Hamilton, had the president of a corporation, and a Superior Court Judge, receiving undisclosed compensation from the purchaser of that corporation's assets. This compensation ultimately totaled over 15% of the adjusted purchase price ($31,185/$200,000). The result of Judge Anderson's actions had trustee Steven Fisher, his former law partner, agreeing to a substantial price reduction without knowing that the former personal representative and current corporation president and Superior Court Judge was being paid by William Hamilton.
Commission Decision, conclusion 5.
Judge Anderson raises several arguments in connection with the Commission's conclusion. His first contention is that the record does not support a finding that the car payments were made simultaneously with the negotiation for price reduction. He also argues that the record establishes the car payments were a gift or, alternatively, the evidence is insufficient to support a finding under the requisite standard of proof that the payments were commissions paid in connection with the sale.
Whether a violation of the Canons occurred in this case largely turns on the credibility of Judge Anderson and Mr. Hamilton and the documentary evidence. According to Judge Anderson, the agreement to sell the bowling alley to Mr. Hamilton was settled in August 1992, prior to his becoming a Superior Court Judge and well before Mr. Hamilton offered to take over his car loan payments. Judge Anderson argues that he had little to do with the sale of the bowling alley business once the estate had closed, and therefore suggests that he was in no position to negotiate anything in exchange for the car loan payments. Judge Anderson describes his role in the subsequent transactions as limited to verifying information for the trustee and the accountant. Judge Anderson argues that he accepted the car loan payments as a gift from a friend. He insists that he was reluctant to accept the payments and did so only because he felt it was important to Mr. Hamilton who had insisted on repaying him for the years of "advice and counsel and friendship" prior to becoming a Superior Court Judge. RP at 261.
Judge Anderson testified that he accepted the car loan payments because he knew that Mr. Hamilton could well afford to make them, and that such an elaborate gift from Mr. Hamilton was not unusual.
Although Mr. Hamilton's testimony tends to corroborate Judge Anderson, a review of the documentary evidence casts grave doubt on their explanation. Indeed, the documents establish that Judge Anderson not only continued to conduct business on behalf of the estate and trust, but also demonstrate that subsequent transactions regarding the sale of the bowling alley business were negotiated at the same time Judge Anderson was receiving car loan payments from Mr. Hamilton.
The first draft of the Business Acquisition and Lease Agreement in August 1992 left several important terms of the sale of the bowling alley business unresolved. Negotiation of these terms continued well after Judge Anderson was sworn in as a Superior Court Judge. Judge Anderson and Mr. Hamilton signed a second draft of the Business Acquisition and Lease Agreement in August 1992; however, that agreement was revised one month later. The final contract of sale was not signed until September 19, 1992, and expressly conditioned closing on the issuance and transfer of gambling and liquor licenses. To satisfy those contingencies, Judge Anderson submitted applications to the Washington State Gambling Commission in late September 1992, and the Washington State Liquor Control Board in October 1992. On December 4, 1992, Judge *434 Anderson executed a bill of sale for the bowling alley business to Pacific Recreation Enterprises, Inc., with the purchase price listed as $300,000. On that same day, Mr. Hamilton issued a promissory note in the amount of $250,000, which Judge Anderson in turn pledged as a security agreement to First Interstate Bank. Contrary to Judge Anderson's assertion that his agreement with Mr. Hamilton anticipated a later price adjustment, none of those documents suggest such an arrangement.
Judge Anderson nevertheless insists that he and Mr. Hamilton understood that the sale was contingent upon Mr. Hamilton receiving the cash flow from the fall season, the most profitable period for the bowling alley. They testified that the reason for a September 1 closing date was to ensure Mr. Hamilton would receive these funds. In order to offset the delayed closing date, Judge Anderson explains he and Mr. Hamilton anticipated that a later adjustment to the sale price would be necessary. However, unlike the gambling and liquor licenses contingencies, none of the documents reflect this cash flow contingency.
Additionally, both Judge Anderson and Mr. Hamilton testified that when the sale did not close as planned, Mr. Hamilton took over management of the bowling alley. Mr. Hamilton was expecting some adjustment to be made later to account for the fall cash flows he was to have received. Thus, Judge Anderson contends the price reduction had been agreed to well before the March 9, 1993 meeting.
Again, documentary evidence does not support this testimony. Nothing in the Business Acquisition and Lease Agreement mentions a price adjustment, fall cash flow, or Mr. Hamilton's company taking on management duties prior to closing. Instead, Judge Anderson's law firm was charging Pacific Lanes, Inc. $1,800 a month to manage the business during that period. Further, when Judge Anderson submitted a signed application to renew the gambling license for the bowling alley, the application, which required a listing of "[a]ll managers/supervisors involved in [the] gambling activity(ies)[,]" did not name Mr. Hamilton. RP at 53; Ex. 1.
The documentary evidence arising out of the March 1993 meeting also belies the claim that Judge Anderson had little to do with the sale after the estate was transferred to a trust in January 1993. Although Judge Anderson testified that his role in the price reduction was limited to verifying information for the trustee and accountant, the discussions regarding the price reduction were recorded as "PACIFIC LANES PURCHASE PRICE ADJUSTMENTS PER DISCUSSIONS WITH GRANT ANDERSON AND BILL HAMILTON." That same document indicated that Mr. Hamilton "really took possession January 1, 1993" and that he would receive a reduction of $92, 829 in the amount owing on the sale. Ex. 61. Moreover, while Judge Anderson testified that he has no independent recollection of how the price adjustment occurred, the trustee and accountant testified that they relied on him for information on how to proceed.
Judge Anderson served as president of Pacific Lanes, Inc. in addition to the estate's two other corporations until mid-October 1993, and resigned only after he executed the closing documents for Mr. Hamilton's purchase of the land and building which housed Pacific Lanes, Inc. His role as president is inconsistent with his claim that he was in no legal position to negotiate anything in exchange for the car loan payments. Judge Anderson concedes that he remained in the capacity of president, but he contends that he only agreed to stay at the request of the trustee and that his role was limited to verifying information regarding his prior work on the estate. Judge Anderson's participation in the March 1993 meeting, and records of that meeting, show that his role was not so limited.
We find it is more than coincidental that the discussions about price reduction occurred just after Judge Anderson began accepting car loan payments from Mr. Hamilton. Judge Anderson's testimony that the car loan payments were a gift, unrelated to the sale of the bowling alley business, is simply not credible. Soon after the car dealership delivered the Cadillac to Judge Anderson in January 1993, Judge Anderson discussed the car loan payments with Mr. Hamilton in his office. It was then that Mr. Hamilton offered to take over the car loan *435 payments on Judge Anderson's newly purchased Cadillac. According to their testimony, they did not determine how much nor how long Mr. Hamilton would make payments. Around the same time, Judge Anderson informed his then wife, Diane Anderson, that Mr. Hamilton had arranged to make the car loan payments on the Cadillac. Ms. Anderson testified that she remembered discussing the purchase of the car because she was surprised by the purchase and concerned about the car loan payments. Judge Anderson then told his wife that the new Cadillac was like a commission for selling the bowling alley business to Mr. Hamilton.
Although Judge Anderson contends that Ms. Anderson's testimony is unreliable, other evidence establishes that the car loan payments were not a gift. The three years' worth of car loan payments were characterized as a necessary and ordinary business expense on Mr. Hamilton's company books and federal income tax returns. Mr. Hamilton treated the car loan payments as a necessary and ordinary business expense on the company books and a tax-deductible item for Pacific Recreation Enterprises, Inc. That same company is the entity through which Mr. Hamilton acquired the estate's bowling alley business. Mr. Hamilton concedes that the car loan payments made for Judge Anderson were the only kind of "gift" he had documented in such a way. RP at 289.
Both Judge Anderson and Mr. Hamilton claim they were unaware that the payments were treated as deductible expenses and that a bookkeeping and accounting error had been made. Judge Anderson maintains he was oblivious of the actual source of payments, while Mr. Hamilton explains that it was an administrative oversight he failed to correct with his accountant. We are unconvinced that Mr. Hamilton, a sophisticated businessman who by his own testimony is accustomed to giving such elaborate gifts, would overlook such an obvious error.
Ultimately, the Commission found Judge Anderson's testimony describing his role in the price reduction of the bowling alley business, and the basis of his acceptance of the car loan payments, not credible in light of the overwhelming evidence and testimony indicating that the two events were directly related. The evidence supports that determination. The Commission has met its burden of proving that Judge Anderson's acceptance of the car loan payments was, in fact, consideration for negotiating the sale of the Hoffman estate's bowling alley business.
Judge Anderson also claims that conclusion 5 of the Commission's Decision included an impermissible finding of fact, i.e., that he may have violated a fiduciary duty, as either a personal representative or corporate officer. He argues that conclusion 5 must be rejected because he was not charged with breaching his fiduciary duty. Conclusion 5 of the Commission's Decision states in relevant part:
Judge Anderson violated Canons 1 and 2(A) of the Code of Judicial Conduct by accepting an offer from William Hamilton to have his car loan payments made by William Hamilton during the same time Judge Anderson and William Hamilton negotiated a reduction of $92,829 in the amount owed by Hamilton's company, Pacific Recreation Enterprises, Inc., to Pacific Lanes, Inc....The result of Judge Anderson's actions had trustee Steven Fisher, his former law partner, agreeing to a substantial price reduction without knowing that the former personal representative and current corporation president and Superior Court Judge was being paid by William Hamilton. The public confidence in the integrity of the judiciary is substantially eroded by such actions. Judicial integrity, if not the fiduciary duty of a personal representative or a corporation president, required Judge Anderson to disclose his agreement to receive over $31,000 from Hamilton.
Commission Decision at 6 (conclusion 5).
The Commission did not base its conclusion that Judge Anderson violated Canons 1 and 2(A) on a finding that the Judge had violated a fiduciary duty. Rather, the misconduct at issue was the negotiation of a sale price reduction for the bowling alley business concurrent with the receipt of three years' worth of loan payments which Judge Anderson failed to disclose to Mr. Fisher, the trustee, and the Public Disclosure Commission. While Judge Anderson may also have violated his fiduciary obligations, such a finding is not necessary for the conclusion that Judge Anderson's conduct fell far short of the standards articulated in Canons 1 and 2(A).
*436 Finally, Judge Anderson argues a finding of violation is unwarranted based on the circumstances surrounding the sale of the bowling alley because his actions were unrelated to how he would act as a judge and were private in nature. Judge Anderson contends that, unlike In re Disciplinary Proceeding Against Kaiser, 111 Wash.2d 275, 759 P.2d 392 (1988), for example, where censure was imposed on a judge who pledged partial treatment and suggested that driving while intoxicated attorneys could buy favorable treatment from their clients, his private conduct at issue is irrelevant to his official capacity as a judge. The Canons apply equally to the judicial and extra-judicial behavior of judges.
Indeed, this Court has broadly interpreted its authority to examine and to discipline for extra-judicial behavior of judges. Turco, 137 Wash.2d 227, 970 P.2d 731. In Turco, this Court found that a judge who shoved his wife to the ground in a public place, an incident that occurred outside of the courtroom, constituted a violation of the Canons. Granted, because not all reprehensible conduct necessarily reflects adversely on the judiciary (or merits judicial discipline), we held that there must be an articulable nexus between the conduct at issue and the performance of judicial duties. Id. Here, the nexus is clear between Judge Anderson's judicial duty under Canons 1, 2(A), 5(C)(3), and 6(C) and the pattern, nature, and extent of his extra-judicial conduct in question.
As the Commission points out, Judge Anderson seeks shelter in the fact that his conduct occurred outside of the courtroom. That does not eliminate, however, the profound impact of such conduct on the public's perceptions of the judiciary. Moreover, the Canons anticipate that such issues relating to extra-judicial conduct may arise. Principles of judicial integrity implicate both judicial and extra-judicial conduct.
2. Continued service as President of three corporations for 10 months.
Canon 5(C)(3) of the Code of Judicial Conduct provides:
Subject to the requirements of Canon 5(C)(1) and (2), judges may hold and manage investments, including real estate, and engage in other remunerative activity, but should not serve as officers, directors, managers, advisors or employees of any business.
Judge Anderson does not seriously dispute the fact that he continued to serve as president of the Hoffman estate's three corporations for 10 months after he was sworn-in as Pierce County Superior Court Judge. As explained, the only argument he advances in defense of his conduct is that once the estate was closed and a trustee appointed, his participation in subsequent transactions was limited to verifying information, and that his failure to resign was a mere administrative oversight.
Judge Anderson's explanation, however, is unconvincing in light of the evidence and testimony by other witnesses indicating that he did more than simply verify information. Judge Anderson advised the trustee and accountant of the price reduction. In March 1993, three months after he became a Superior Court Judge, Judge Anderson participated in the formal discussions to reduce the amount owing by Mr. Hamilton. Judge Anderson did not resign until October 1993, after he executed the closing documents for Mr. Hamilton's additional purchase of the land and building which housed the bowling alley business.
Judge Anderson's dismissal of his prolonged role as an executive officer of three corporations demonstrates a careless disregard for the principles upon which the judiciary is founded. Judge Anderson's willingness to continue serving as president of the estate's corporations, his active participation in the affairs of the trust, as evidenced by his negotiation of the price reduction of the bowling alley business, show that Judge Anderson failed to seriously consider the inappropriate nature of his conduct. Judge Anderson's continued role as president of the estate's three corporations is indefensible.
We are convinced that the evidence establishes by clear, cogent, and convincing evidence that Judge Anderson violated Canons 1, 2(A), 5(C)(3) of the Code of Judicial Conduct in his role as president of the estate's corporations.
3. Failure to report receipt of car loan payments on the Public Disclosure Commission Filings for 1993, 1994, 1995.
Canon 6 of the Code of Judicial Conduct provides:

*437 Judges may receive compensation and reimbursement of expenses for the quasi judicial and extrajudicial activities permitted by this Code, if the source of such payments does not give the appearance of influencing the judges in their judicial duties or otherwise give the appearance of impropriety, subject to the following restrictions:
. . . .
(C) Public Reports. A judge shall make such financial disclosures as required by law.
The acceptance of $31,185 in car loan payments from Mr. Hamilton was compensation. Judge Anderson failed to disclose such compensation in his public disclosure filings for the years 1993 ($9,600), 1994 ($9,600), and 1995 ($11,985). His failure to report this compensation plainly violated Canon 6(C).
The Commission has met its burden in proving that Judge Anderson's conduct was in violation of Canons 1, 2(A), and 6(C).

SANCTIONS
The Commission ordered Judge Anderson to attend a judicial ethics course and amend his filings with the Public Disclosure Commission, and suspended him for four months without pay. Judge Anderson challenges each of these sanctions.
As stated at the outset of our analysis, this court gives serious consideration to the Commission's recommended sanctions, but is not bound by those recommendations. In re Disciplinary Proceedings Against Turco, 137 Wash.2d 227, 246, 970 P.2d 731 (1999); In re Disciplinary Proceeding Against Ritchie, 123 Wash.2d 725, 870 P.2d 967 (1994); In re Disciplinary Proceeding Against Deming, 108 Wash.2d 82, 88, 736 P.2d 639, 744 P.2d 340 (1987). Article IV, section 31(5) of the Washington State Constitution provides that "[u]pon the recommendation of the commission, the Supreme Court may suspend, remove, or retire a judge or justice." (Emphasis added.) The court may not impose a sanction, however, until, following notice and a hearing, the commission "recommends that action be taken" and this court has conducted a hearing, after notice, to review commission proceedings and the commission's findings. Id. The constitution specifically requires that before this court considers imposing a sanction the Commission must investigate a complaint against a judge or justice or investigate a belief that a sanction should be imposed, determine based on an initial proceeding that probable cause exists to believe a judge or justice has violated a rule of judicial conduct or suffers from a disability interfering with performance of judicial duties, and conduct a public hearing before making a recommendation that this court impose a sanction. See Const. art. IV, § 31(2), (3), (4). These provisions assure that the Commission carries out its constitutionally mandated role of investigating, determining probable cause, and holding a public hearing, so that before this court considers sanctions the allegations or belief of misconduct or disability are examined and due process is afforded the judge or justice. While the constitution requires that there be a recommendation that some action be taken, the constitution does not limit this court's role merely to approving or reversing the Commission's recommended sanctions.
To the contrary, the constitution expressly grants the judge or justice the "right of appeal de novo" to the Supreme Court. Const. art. IV, § 31(6). As we explained in Turco, 137 Wash.2d at 246 n. 5, 970 P.2d 731, the constitutional right of appeal de novo involves judicial review from which we make our own determination of the facts and of the law, including our own determination of the appropriate sanction.
In this case, we do not agree with the Commission's recommended sanctions. Most importantly, we find a four-month suspension far too lenient under the circumstances in this case. Instead, the appropriate sanction is removal of Judge Anderson from his judicial office.
In determining the appropriate sanction for judicial misconduct, this court considers:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out *438 of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.
Deming, 108 Wash.2d at 119-20, 736 P.2d 639. See also CJCRP 6(c).
Judge Anderson claims that his actions were not part of a pattern or did not occur with frequency. This claim ignores the overwhelming evidence to the contrary. An independent review of the record establishes that Judge Anderson's misconduct was not isolated, but occurred over a period of three years. Judge Anderson continued to serve as president of the estate's corporations. His participation in the affairs of the estate and trust were not minimal, as shown by his direct participation in the negotiations to reduce the price of the bowling alley business in favor of his friend Mr. Hamilton. Even after facilitating the price reduction, Judge Anderson remained as president of the estate's corporations, long enough to execute the final documents for Mr. Hamilton's additional purchase of the land and building which housed the bowling alley business.
Judicial integrity and a judge's duty to avoid the appearance of impropriety prohibited Judge Anderson from accepting the car loan payments from Mr. Hamilton while negotiating the sale of the bowling alley, and required him, at the least, to disclose those payments on his public disclosure filings. Clearly, Judge Anderson's continued participation in the affairs of the estate after he became a Superior Court Judge, and his failure to disclose his receipt of the payments he received over a period of three years demonstrate an extended pattern of misconduct.
In the face of such overwhelming evidence, however, Judge Anderson refuses to admit that he received the car loan payments while participating in subsequent discussions to reduce the price of the bowling alley business in favor of Mr. Hamilton. Judge Anderson's failure to acknowledge or recognize that he committed any misconduct at all weighs heavily against him in our determination of the appropriate sanction.
In continuing to serve as president of the estate's corporations, Judge Anderson never evidenced an effort to change or modify his conduct. Judge Anderson believes that because the incidents occurred a number of years ago, it would be impossible for him to show an effort to change or modify his conduct. Opening Br. of Resp't Judge at 48. Moreover, Judge Anderson argues that the only reason to sanction the alleged misconduct is because of the effect of such conduct on the integrity of and respect for the judiciary, and that his alleged violations of the Canons are insignificant and do not warrant sanction.
This argument demonstrates Judge Anderson's complete failure to understand or his willful denial of the magnitude of his misconduct. It demonstrates his disregard of the importance of the integrity of the judiciary, both in the sense of the individual judge's personal integrity and in the sense of the integrity of our justice system. The judicial branch of government depends upon the public's confidence and respect. Judge Anderson's misconduct has eroded the integrity and respect for the judiciary to such a degree that he must be relieved of the duties of office. See RCW 2.64.010(5).
We note that the Commission considered four mitigating factors: the misconduct occurred outside of the courtroom; the misconduct was not committed in Judge Anderson's official capacity as a judge except as to his duty to comply with the financial disclosure laws; Judge Anderson served as a part-time municipal judge and superior court judge for 14 years; and Judge Anderson's position as a judge was not exploited to engage in the misconduct. Commission Decision at 8. We find none of these factors sufficient to justify a sanction less than removal.
In Ritchie, 123 Wash.2d at 732, 870 P.2d 967, a district court judge was removed because he was found to have repeatedly misrepresented the purpose of his travel as judicial business when seeking reimbursement *439 for car and lodging expenses. Although the purpose of his trips to Jamaica, Arizona, and Florida was personal, the judge would characterize his travel as a "conference" or "law related education" when in fact judicial business was wholly incidental to the purpose of his trips. Id. Such conduct, this Court found, warranted the judge's removal in light of the pattern of misconduct and the extent to which the judge, in his official and personal capacity, acted dishonestly. Ritchie, 123 Wash.2d at 736, 870 P.2d 967.
Here, Judge Anderson's continued participation in the sale of the bowling alley business, his deliberate failure to disclose payments on his public disclosure filings, and his attempt to misrepresent the car loan payments as a gift clearly exhibit a pattern of dishonest behavior unbecoming of a judge. Judge Anderson's refusal to acknowledge the enormity of the effect of his conduct on the integrity of the judiciary and the public's confidence further demonstrates his unfitness for judicial office. Given the egregious nature and extent of Judge Anderson's misconduct, the Commission's recommendation of suspension for four months without pay is too lenient, and removal from office is the appropriate sanction.
Next, we turn briefly to the Commission's remaining recommendations. The Commission ordered that Judge Anderson attend a judicial ethics class and amend his filings with the Public Disclosure Commission. Because we remove him from office, these sanctions are unnecessary.[4] Judge Anderson will not be eligible for judicial office in the future unless his eligibility is reinstated by this Court. Const. art. IV, § 5; DRJ 10(a). Accordingly, we reverse the Commission's order of correction action.

CONCLUSION
We hereby order Judge Anderson's removal from office.
DURHAM, SMITH, and IRELAND, JJ., MORGAN, SHIELDS, SWEENEY, and WINSOR, J.P.T., concur.
NOTES
[1] The Washington State Gambling Commission did not indicate its intent to approve the application for a gambling permit until November 12, 1992.
[2] A liquor license was obtained from the Washington State Liquor Control Board by Judge Anderson on July 1, 1992, but required an application for transfer of the license as a condition of the Business and Acquisition and Lease Agreement.
[3] A 1989 appraisal for the bowling alley business, including the building and land in which it was located, estimated the aggregate price of all three at $ 1,334,000. Although the record is unclear as to how Judge Anderson and Mr. Hamilton arrived at the price of $300,000 for the bowling alley business, Judge Anderson testified that he approached Mr. Hamilton about selling him the business, building, and land as an entire package for $1,000,000.
[4] We also note that penalties for violation of our state public disclosure laws are provided for by statute.