**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 10, 2001**

IN RE HONORABLE CYNTHIA GRAY HATHAWAY,
        Judge of the Third Circuit Court,
        Detroit, Michigan.

No. 112495

_____/

PER CURIAM

The Judicial Tenure Commission recommends that we suspend Wayne Circuit Judge Cynthia Gray Hathaway for thirty days, without pay, for misconduct in the performance of her judicial office. Because we conclude that the severity of the misconduct at issue warrants greater discipline than recommended, pursuant to Const 1963, art 6, § 30(2) and MCR 9.225, we modify the recommendation of the commission and order that Judge Hathaway be suspended without pay for a period of six months.

I

Facts

The recommendation of the Judicial Tenure Commission is based on its findings of fact. In turn, those findings are adopted from findings made by the master.[1] Specifically, the commission found that Judge Hathaway acted improperly in her handling of two cases, and in an overall lack of industry that was exemplified by a third case.[2]

---

[1] MCR 9.210, 9.215.

[2] The master further found that Judge Hathaway had committed judicial misconduct in her dispositive rulings in several cases that are not discussed in this opinion. The commission rejected those findings, explaining:

Based on the record before us, the decision-

A

The first case is a drug prosecution, *People v Spearman*, in which Judge Hathaway conducted an arraignment at a Detroit police precinct. With regard to this case, the commission adopted these findings of the master:

> Late in the afternoon of May 6, 1997, Attorney Otis Culpepper, criminal lawyer, called the Respondent at her home as she was arriving from work. He advised that his client, Bruce John Spearman[,] had been arrested by the Detroit Police Department on a marijuana charge. His client was on bond from federal district court on a drug charge. Bond was $30,000 cash and required that he wear a tether. He further requested that Respondent come to the 7th District Precinct office and arraign the defendant so that he could be released and abide by the federal release restriction to be at his home by 7:30 in the evening. Police Lt. Gary D. Hendrix and Attorney Otis Culpepper both testified that Respondent knew that there were additional drug charges, including cocaine and heroin, before the arraignment. Notwithstanding that, the arraignment took place on the 5th floor of the police precinct because there was an altercation in the lobby of the 1st floor. At the time of the arraignment, Respondent had no documentary evidence of the charges and arraigned the defendant on "a warrant for marijuana" only. At the time, however, Respondent had been informed by Lt. Gary D. Hendrix of the fact there was a warrant for cocaine and heroin. This was not mentioned in the arraignment. Respondent fixed bond at $10,000, 10%. Bond was furnished by Attorney Culpepper and Defendant Spearman was released from custody and ordered to report the following day to fix a date for his preliminary examination.

> Defendant Spearman absconded on bond and was not arrested until January 21, 1998, in St. Louis, Mo., and returned to this jurisdiction.

> There was testimony that the ususal procedure on an arrest of this type was to detain the defendant and have him arraigned the following morning before a circuit judge or magistrate. At that time, the police record and other information about the defendant and the crime would be available to have at the arraignment. Respondent also knew that Christine A. Kowal, Assistant Prosecuting Attorney, was on her way to attend the arraignment and also knew that Sgt. Dwane Blackmon was on his way with a copy of the defendant's police record. Notwithstanding this, Respondent decided to go ahead with the arraignment because she had "waited long enough." She said that she was aware of the federal charge and bond and felt that a larger bond was not required under these circumstances. Both Lt. Hendrix and Assistant Prosecutor Kowal advised that they had never

---

> making by the judge in these specific cases is not a matter for a determination of judicial misconduct by the JTC. It is not the responsibility of the JTC to function as an appellate court nor can erroneous decisions by a judge made in good faith and with diligence be grounds for judicial misconduct. MCR 9.203(B).

experienced an arraignment such as this before a circuit judge in the police precinct. Other attorneys and police officers testified that they never knew of such a proceeding and it was against all accepted procedures and court rules.

On the basis of these findings, the commission reached the following conclusion:

> The arraignment conducted by the Respondent at the 7th Precinct headquarters in *People v Spearman* was inappropriate in that it was contrary to all practice and procedure under court rules and contrary to the practice and custom in Wayne County. It was not conducted in court during normal business hours and was conducted without a prosecutor present. A questionable bond was established under the circumstances considering the crimes alleged. The entire procedure gave the appearance of impropriety, contrary to Canons 1, 2, and 3 of the Code of Judicial Conduct and MCR 9.205(A) and (C)(4).

B

The second case on which the commission's recommendation for discipline is based is *People v Crosse*. With regard to *Crosse*, the commission adopted the following findings:

> Defendant Crosse, a middle-aged man who had retired to the Upper Peninsula, was charged with CSC-1 and CSC-2 by a teen-age girl who was a former neighbor. It was agreed between defendant's counsel and Respondent that the cases against defendant in Macomb County would be tried first. He was acquitted of the Macomb County charges and Respondent attempted to induce Defendant Crosse to waive a jury so that the case could be expedited. Defendant Crosse, however, insisted upon a jury trial and Respondent threatened to put him in jail if he did not waive the jury.

> At approximately 11:00 a.m., April 28, 1997, when the case had not been called, defendant and his attorney left the courtroom, notifying the prosecutor that they were stepping out for a "cigarette" and would be available when the case was called. Shortly thereafter the case was called and when the defendant and his attorney were not immediately in the courtroom and ready to proceed, Respondent ordered a habeas issued for the arrest of both the attorney and defendant.

> Within a few minutes, defendant appeared in the courtroom and Respondent had him arrested and detained in a restricted area of the courtroom. When defendant's counsel returned, he was released. The trial did not start on that day, but on the following day, April 29, a jury was sworn and, again, the matter was adjourned until April 30, 1997, at 9:00 a.m. It was then adjourned to May 8, 1997, and continued on May 12, 1997.

> Defendant's attorney then filed a motion for a speedy trial to be heard on May 8, 1997. Respondent showed her anger at the hearing of this motion, and accused defendant's counsel of "dishonesty" and cut him off from placing matters on the record. Her anger was apparent to all in the courtroom, and the matter appeared to be delayed solely because of defendant's resistance to

3

waive a jury.

This was obviously prejudicial conduct on the Bench, which was apparent to all who were in the courtroom.

With respect to *Crosse*, the commission reached this conclusion:

Respondent's conduct in the case of *People v Crosse*, wherein Respondent threatened to put defendant in jail if he did not waive his constitutional right to a jury trial, as well as questionable adjournments in view of defendant's resistance to waive a jury, constituted a failure to properly perform Respondent's judicial duties, as well as conduct prejudicial to the administration of justice, contrary to Canons 1, 2 and 3 of the Code of Judicial Conduct and MCR 9.205(A) and (C)(4).

C

The third basis for the commission's recommendation of discipline is a problem noted in connection with *Crosse*——a remarkable pattern of adjourning cases and failing to attend in timely fashion to the business of the court. An example is the handling of a case called *People v Ketchings*. Here, the commission adopted the following findings of the master:

Defendant Ketchings was one of four co-defendants accused in a shooting death of a 9-year old girl. Separate trials were set for the four defendants. Respondent tried the first three, who were convicted and given extended prison sentences. The Ketchings matter was finally set for trial for December 9, 1996. The attorneys were ready for trial, efforts were made to negotiate a plea which were unsuccessful, and Respondent adjourned the trial until January 30, 1997. Both the attorneys were ready to proceed on that date. The matter was adjourned because Respondent said "She did not feel like hearing it" on that date and later recused herself. The attorneys then went to Chief Judge Michael Sapala, who attempted to induce the Respondent to try the matter but was unsuccessful. When the attorneys returned to the courtroom, Respondent recused herself on the basis that she could no longer be impartial because she had tried the other three defendants. Both attorneys tried to persuade her to proceed with the trial since she would not be the trier of the facts and would only have to make rulings upon the evidence. Respondent refused to try it.

The case was thereafter assigned to Judge Harvey Tennen, who because of the substantial delay, was compelled to release Defendant Ketchings pending trial. There had been no evidence that she was going to recuse herself or had even thought about it when she reset the case on December 9, 1996, to be tried on January 30, 1997, so another trial date was set.

Some of the problems with scheduling and finding that the case was adjourned were vividly set forth by Lisa Lindsey, Special Assignment, Assistant Prosecuting Attorney in the Ketchings

4

case.

"Well, the adjournments on the Ketchings case, you have to take into combination with the other codefendants. All the witnesses were the same on each case, and as it relates to having witnesses who are cooperative, having witnesses who are available, it really impacted on the witnesses because the witnesses would come down. Even the police witnesses they would come down. They would be there and nothing——and it wouldn't go. And the witnesses——I know specifically in the civilian witnesses, we had a lot of trouble with the civilian witnesses. We had to get bench warrants for the civilian witnesses in order to get them in.

"At some points, I was literally begging the witnesses to show up for the next hearing. The witnesses would curse me out, and it just——and then, you know, they would just——they would cuss——curse me out. I mean, you know, they'd be very profane, very upset. They'd complain that they were taking off from work, not getting paid. The victim's mom, she was always very, very upset.

"And then you would have——when the witnesses would come down, every time the witnesses would be there, the defendant's family and friends would be there, and there would always be a situation where in the hallways you would worry about whether a fight was going to break out between the victim's family and the defendant's friends and family. They'd be out there wolfing [sic]. When I say wolfing, it's a slang term, you know, for talking back and forth at each other and things of that nature. So it was difficult."

These are clear violations of the statute and Canons of judicial conduct and prejudicial to the administration of justice.

In addition to the facts pertinent to *Ketchings*, the master made additional findings regarding Judge Hathaway's handling of her docket and her apparent pattern of absence. In this respect, the master relied on a report submitted in 1996 by Susan B. Boynton of the State Court Administrative Office. The contents of this report, which Ms. Boynton confirmed in her testimony at the hearing, included this:

Examination of the daily court sheets in the Systems Department at Recorder's Court presents another possible theory for the increase in adjournments. For many days during the summer, all proceedings were adjourned and the judge's signature was stamped at the bottom of the daily court sheets, not signed as required by the Recorder's Court Docket Control Directive 93-5 (see attachment 2).[3] The same Directive requires the

---

[3]
Docket Control Directive: DCD No. 93-5
Date: February 1, 1993
Re: Maintenance of Records on Court Sheets

1. Each judge shall personally sign the court sheets recording each day's activity.

court clerk to indicate on the court sheet if the judge takes an unanticipated leave for vacation or illness. There were no indications on the court sheets in those months and no leave of any type reflected in the Recorder's Court official attendance record [4] for Judge Hathaway during those months.

If judicial leave cannot explain the high number of days when all or most of the proceedings were adjourned, then the possibility exists that Judge Hathaway was choosing not to do the scheduled work in her courtroom. For example, June, 1996 had 20 working days. The court sheets are missing for two days, six days had all matters adjourned and four days had most proceedings adjourned. Trial activity occurred on three days during the month, resulting in one guilty verdict and one mistrial.

August, 1996 shows a similar pattern of work habits. No official leave is recorded, yet nine of the 19 working days on the court sheets showed that all matters were adjourned and on another two days most matters were adjourned. There was no trial activity in August other than a plea at a scheduled jury trial.

In light of the facts pertaining to *Ketchings* and Judge Hathaway's more generalized failure to perform the duties of office, the commission reached this conclusion:

Respondent's constant and repeated adjournments of proceedings without good cause, as exemplified in the case of *People v Ketchings*, as well as repeated unnecessary and unexcused absences from judicial responsibilities during normal court hours were inappropriate. Likewise, Respondent's overall lack of industry and proper management of her court docket as well as an unwillingness to take corrective action or accept constructive suggestions or assistance to improve case management, constituted a hindrance to the administration of justice and gave the appearance of impropriety, all contrary to Canons 1 and 3 of the Code of Judicial Conduct and MCR 9.205(A) and (C)(2) and (4).

D

The overall conclusion of the commission was that Judge Hathaway "has committed misconduct in office, in violation of MCR 9.205(C), and violated the provisions of Canons 1, 2 and 3 of the Michigan Code of Judicial Conduct." Without

---

2. If the judge takes an unanticipated leave for vacation or illness, it should be indicated by the court clerk on the court sheet. If the judge comes in and leaves because of illness or other business, that should also be indicated on the court sheet.

3. In the absence of a judge on pretrial day, a court clerk may not set subsequent proceeding dates and indicate on the court sheets that pretrial was held.

[4] The record of this case does not contain the "official attendance record."

additional explanation, the commission then recommended that this Court accept its findings of judicial misconduct and impose a thirty-day suspension without pay.[5]

## II

In lieu of acting upon that recommendation, we remanded this case to the commission "for the articulation of standards of judicial discipline, and the application of those standards to the instant case, in order that this Court can meaningfully carry out its powers of judicial review under Const 1963, art 6, § 30(2). See *In re Brown*, [461 Mich 1291 (2000)]." 461 Mich 1296 (2000).

On remand, the commission renewed its recommendation of a thirty-day suspension without pay. The commission did not provide further elaboration of its reasoning, noting that "the composition of the Commission has changed substantially" since its initial recommendation. The commission added:

> In the future the Commission will, to the extent possible, cite additional factors which may facilitate the Supreme Court's review of sanctions imposed by the Commission.

This Court then placed the case on its calendar,[6] and directed the parties to brief the issue "whether the proposed suspension of thirty days without pay is sufficient discipline in this case." 462 Mich 1233, 463 Mich 1201 (2000).

## III

The Judicial Tenure Commission was established in 1968 when the people of Michigan amended the constitution to add a § 30 to article 6. When the commission comes to this Court with a recommendation for discipline, it invokes the Court's jurisdiction under Const 1963, art 6, § 30(2), which provides:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of

---

[5] Eight of the nine commission members heard this matter. All eight concurred in the recommendation.

[6] MCR 9.224(C), (F).

proceedings.

Under this Court's constitutional authority to make rules implementing Const 1963, art 6, § 30, we promulgated GCR 1963, 932 in early 1969.[7]  381 Mich lxxxiii (1969).  When the General Court Rules of 1963 were replaced in 1985 by the Michigan Court Rules, the provisions of GCR 1963, 932 were placed in separate rules within subchapter 9.200.  419A Mich 552-569 (1985).

When this Court receives a disciplinary recommendation from the commission, it has authority to "censure, suspend with or without pay, retire or remove" a judge.[8]  Const 1963, art 6, § 30(2).  On receipt of such a recommendation, this Court undertakes a de novo review of the matter.  *In re Ferrara*, 458 Mich 350, 358; 582 NW2d 817 (1998).  This review occurs whether or not the respondent judge files a petition with this Court.  MCR 9.224(A), (C).

In 1969, when this Court exercised its constitutional rulemaking authority under Const 1963, art 6, § 30 by implementing GCR 1963, 932, we included this subrule:

> The Supreme Court shall review the record of the proceedings on the law and facts and shall file a written opinion and judgment directing censure, removal, retirement, suspension, or other disciplinary action as it finds just and proper, or reject or modify, in whole or in part, the recommendations of the commission.  [GCR 1963, 932.25.]

That subrule was not amended until 1985, when it was replaced by MCR 9.225:

> The Supreme Court shall review the record of the proceedings and shall file a written opinion and judgment which may direct censure, removal, retirement, suspension, or other disciplinary action, or reject or modify the recommendations of

---

[7] We earlier had promulgated GCR 1963, 931 as a transitional rule.  381 Mich lxxxii (1968).

[8] Independent of Const 1963, art 6, § 30, which the people of Michigan added to the constitution in 1968, this Court has general superintending control of all Michigan courts.  Const 1963, art 6, § 4.  This provision is a broad grant of constitutional authority to take necessary action, short of the outright removal of a judge.  See *In re Probert*, 411 Mich 210, 229-233; 308 NW2d 773 (1981).  See also *In re Huff*, 352 Mich 402; 91 NW2d 613 (1958) and the discussion of *Huff* by the framers of the 1963 constitution.  1 Official Record, Constitutional Convention 1961, p 1269-1287.  In the present case, there is no need to explore the nature or dimensions of this Court's authority under Const 1963, art 6, § 4.

the commission.

The court rule states our authority to modify a recommendation of the commission, and the meaning of the word "modify" encompasses authority to alter the recommended discipline. Random House Webster's College Dictionary defines "modify" as follows:

> [T]o change somewhat the form or qualities of; alter partially; amend; *to modify a contract*. RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 843 (2nd ed. 1997).[9]

Our respect for the judgment of the men and women who have served on the commission is substantial, and to date we have not had occasion to increase the discipline recommended for a respondent judge——we likewise anticipate that few such occasions will arise in the future. Yet our authority to increase the recommended discipline is clear.[10]

---

[9] The dissent purports to rely upon two dictionary definitions that seemingly restrict the meaning of "modify" to its "limiting" sense. Both of the dictionaries the dissent references, however, include the definition of "modify" we rely upon here.

[10] There is no indication that the use of the term "modify" was intended to permit or preclude this Court from altering the recommended discipline so as to adequately address the nature of the ethical infraction at issue. Illustratively, the term "modify", if construed to mean that this Court could only reduce a sanction recommended by the JTC, would, in our judgment, deny this Court the ability to fairly and effectively carry out its obligations under MCR 9.225 to "review" the JTC's record and to file a "written opinion and judgment" in accord with that review. As we recently observed in an order of remand to the JTC:

> The most fundamental premise of the rule of law is that equivalent misconduct should be treated equivalently . . . it is the burden of the JTC to persuade this Court that it is responding to equivalent cases in an equivalent manner and to unequivalent cases in a proportionate manner. In other words, to demonstrate that there is a consistently enforced system of judicial discipline in Michigan.
>
> * * *
>
> The importance of such standards is both in ensuring that the JTC is consistent in its consideration of factors relevant to the level of sanctions, and in enabling this Court, by its constitutional obligation, to meaningfully review the JTC's recommendations. *In re Brown*, 461 Mich 1291, 1292 (2000).

Just as there is an obligation upon the JTC, derived from the fundamental "rule of law", to sanction in an equivalent and proportionate manner, so too does this Court have such an obligation under MCR 9.225. Satisfying this obligation would not be possible if this Court could only "modify" the recommended sanctions of the JTC in a downward manner. Unless "modify" is given its ordinary meaning, to change or to alter,

That we have authority to alter the recommended discipline is bolstered by the persuasive decision of the Washington Supreme Court in *In re Disciplinary Proceeding against Anderson*, 138 Wash 2d 830; 981 P2d 426 (1999). Working from a similar grant of constitutional authority,[11] the Washington Supreme Court considered a recommendation from the state's Commission on Judicial Conduct[12] that a judge be suspended without pay for four months and required to take a specified "course of corrective action." 138 Wash 2d 840. For reasons stated at length by the Washington Supreme Court, it decided instead to remove the judge from office. 138 Wash 2d 854. With regard to its authority to take such action, the Washington Supreme Court explained:

> This court reviews judicial disciplinary proceedings de novo. *In re Discipline of Deming*, 108 Wash 2d 82, 87-89; 736 P2d 639; 744 P2d 340 (1987). De novo review of judicial disciplinary proceedings requires an independent evaluation of the record as the court is not bound by the Commission's findings or conclusions. *In re Discipline of Turco*, 137 Wash 2d 227, 246; 970 P2d 731 (1999). De novo review does not mean that the Supreme Court conducts a new evidentiary hearing. Rather, this court must independently determine if the judge violated the Code of Judicial Conduct, and, if so, the proper sanction to be imposed. *Id*. The Commission bears the burden of proving factual findings by clear, cogent, and convincing evidence. *Id*. In evaluating the evidence, we necessarily give considerable weight to credibility

---

the simultaneous pursuit of equivalence and proportionality in this Court's review of the recommendations of the JTC, would, in many cases, be unattainable. Because we do not believe that these objectives are in tension with one another, or that there are occasions on which we should be constrained by one from achieving the other, "modify" is properly interpreted, in our judgment, to enable either upward or downward changes in the recommendations of the JTC.

[11]

> Upon the recommendation of the commission, the supreme court may suspend, remove, or retire a judge or justice. The office of a judge or justice retired or removed by the supreme court becomes vacant, and that person is ineligible for judicial office until eligibility is reinstated by the supreme court. The salary of a removed judge or justice shall cease. The supreme court shall specify the effect upon salary when it suspends a judge or justice. The supreme court may not suspend, remove, or retire a judge or justice until the commission, after notice and hearing, recommends that action be taken, and the supreme court conducts a hearing, after notice, to review commission proceedings and findings against the judge or justice. [Wash Const, art 4, § 31(5).]

[12] As in Michigan, the Washington commission is itself a creature of the constitution. Wash Const, art 4, § 31(1).

10

determinations by the Commission, as the body that had the opportunity directly to observe the witnesses and their demeanor. *Id*. Additionally, we give serious consideration to the Commission's recommended sanctions. *In re Discipline of Ritchie*, 123 Wash 2d 725; 870 P2d 967 (1994). *Nevertheless, the Commission's recommendation is just that. The constitution's use of the word "recommend" indicates an intent to place the ultimate decision to discipline in the Supreme Court. Deming*, 108 Wash 2d at 88. [138 Wash 2d 843 (emphasis supplied).]

IV

We explained in *Ferrara* that "[o]ur primary concern in determining the appropriate sanction is to restore and maintain the dignity and impartiality of the judiciary and to protect the public." 458 Mich 372. Thus, we chose a course of discipline that was "based on the nature, extent, and frequency of the misconduct." 458 Mich 373.

Earlier, we had said this in *In re Hocking*, 451 Mich 1, 24; 546 NW2d 234 (1996):

> In assessing the appropriate sanction in judicial disciplinary proceedings, our primary charge is to fashion a penalty that maintains the honor and the integrity of the judiciary, deters similar conduct, and furthers the administration of justice. See *In re Seitz*, 441 Mich 590, 624; 495 NW2d 559 (1993).

In this Court's *Brown* decision, we listed the following standards, though not an exhaustive list, that the JTC shall consider in making its recommendation:

> (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;

> (2) misconduct on the bench is usually more serious than the same misconduct off the bench;

> (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

> (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

> (5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

> (6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

> (7) misconduct that involves the unequal application of justice on the basis of such

11

considerations as race, color, ethnic background, gender, or religion is more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. *Brown*, *supra*, at 1292-1293 (2000).

In its *Anderson* decision, the Washington Supreme Court elaborated on similar criteria.[13]

In the present case, we cannot agree with the commission that a thirty-day suspension without pay is sufficient discipline. Applying the *Brown* standards to the instant case, we believe that the course of sustained judicial misconduct that this record reveals requires stronger disciplinary action than the thirty-day suspension without pay that Judge Hathaway consented to and which the JTC recommended to this Court. In particular, we conclude that Judge Hathaway's protracted refusal to attend to her judicial duties has worked an injustice, not only upon the defendants charged with crimes who had every legitimate expectation that their cases would be handled expeditiously by the court, but also the witnesses in those matters, the very people on whom our system of justice depends. The repeated unexplained adjournments of matters pending before Judge Hathaway have worked an injury upon the public and potentially contributed to the increasing cynicism about our judicial system, its efficacy and fairness.

The circumstances of the arraignment in *Spearman* were utterly irregular. The confusion regarding the charges against Mr. Spearman and regarding the advisability of facilitating his release were the direct result of Judge

---

[13] In determining the appropriate sanction for judicial misconduct, the court considers:

(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires. *Deming*, 108 Wash 2d at 119-120. [138 Wash 2d 854-855.]

Hathaway's inexplicable decision to place the interests of Mr. Spearman and his counsel, Mr. Culpepper, ahead of all other interests, including protection of the public. We employ the term "inexplicable" advisedly, since no remotely convincing explanation has yet been tendered for the handling of the *Spearman* arraignment, nor can we imagine one.

The improper effort to persuade Mr. Crosse to waive his right to a jury trial is another example of a serious one-time breach of Judge Hathaway's responsibility to use her judicial power lawfully. However, it surely was connected to a more serious problem that was ongoing——her prolonged failure to attend in timely fashion to the business of her court.

*Ketchings* was chosen by the commission as an example of a case in which Judge Hathaway's refusal to do her work caused profound suffering for the family of the victim and outrageous inconvenience for the witnesses. However, it is only an example. The record of this case amply demonstrates the remarkable extent of Judge Hathaway's failure to discharge her judicial duties. We are not talking here of a failure to move papers or to file administrative reports. Nor are we talking about a judge having "a bad day"——or several. Rather, this disciplinary proceeding concerns a judge who has simply declined over an extended period to do her work.

Again citing *Ketchings* only as an example, the record reflects twenty-one adjournments, five initiated by the defense, none by the prosecution, and sixteen by the court. After all this, the parties gathered for trial on January 30, 1997, only to be advised by Judge Hathaway that another adjournment would occur because "I just don't feel like doing it." Judge Hathaway then inexplicably recused herself from the case, causing still more delay. The assistant prosecutor described the mother of the nine-year-old victim as "devastated" by the events of January 30. This record establishes, if not a pattern of deliberate misconduct, capricious conduct shockingly lacking in appropriate judicial deliberation.

This is indefensible conduct. A judge's whimsical

13

decision whether to work on a particular day, or during particular months, cannot take precedence over the affairs brought to the courthouse by the people for resolution.

As with *Spearman*, we are further troubled by the absence of any plausible explanation for this conduct. Judge Hathaway generally denies excessive absences, and relies on the fact that her docket is reported to be current at this time. Absent some understanding of *why* these problems occurred, or even a direct acknowledgment that such a situation existed, we see no reasonable basis for assuming that these problems are safely behind her.[14]

For these reasons, we disagree with the JTC's recommendation that respondent be suspended only thirty days without pay. In our judgement, the conduct of respondent is deserving of far more serious discipline that is in keeping with severity of the breach of standards of judicial conduct demonstrated in this record. The discipline sanction should (1) first and foremost impress upon the respondent the severity and significance of her misconduct and (2) serve as a strong motivation to deter her from future misconduct. Highly relevant to our determination is the fact that Judge Hathaway has never on this record acknowledged the nature of her misconduct, or the deleterious effect that it has had on the persons who appeared before her, or on the public's perception of the judiciary.

We conclude that our disciplinary goals will be best served if Judge Hathaway is suspended without pay for a period of six months.[15]

---

[14] Indeed, the only *Brown* criterion not implicated in this record is criterion seven. There is no evidence that any of Judge Hathaway's actions or inactions were predicated upon consideration of race, sex or any other impermissible characteristic.

[15] Likewise, in *In re Moore* we ordered that Judge Moore be suspended for a period of six months without pay. We recognize that the *Brown* standards, as applied to the conduct of Judges Hathaway and Moore, support proportionate sanctions. A six-month suspension without pay is justified in *Moore* because of Judge Moore's pattern of misconduct extending over a period of twenty years. Though Judge Hathaway's misconduct occurred over a shorter period of time in comparison to that of Judge Moore, we believe a six-month suspension is justified because of the troubling nature of Judge Hathaway's conduct. Accordingly, the misconduct engaged in by both Judges Hathaway

14

V

The dissent contends that this Court does not have the constitutional authority to *increase* the discipline recommended by the JTC. In fact, the dissent suggests that to do so violates our duty to the constitution. We believe, to the contrary, that the dissent's position is inconsistent with the constitution. The dissent's view results in partial "immunization" of JTC decisions from accountability to any elected branch of government and is contrary to the central organizing principle of constitutional government–control by the citizens, either indirectly (election of legislators, executive or judicial officers all of whom are accountable for their actions and the actions of their agents) or directly (initiative or referendum) of all aspects of government. Under the dissent's approach, the JTC, selected not by the people but by lower court judges, the State Bar of Michigan, and the Governor,[16] could conceivably give mild wrist slaps to seriously misbehaving judges, and no one that reports directly to the people, no member of this Court, no legislator, and no Governor could do a thing about it. Such a departure from fundamental constitutional theory, namely, a departure from electoral accountability, should be a power found only if very clearly stated in the constitution. We do not have that situation here. Indeed, the dissent's position can only be attained by torturing the definition of the word "modify," suggesting that it only means a downward departure.

This is an interesting position for the author of the dissent to advocate, given that only six months ago he voted to *increase* a JTC recommended sanction. See *In re Runco*, 463 Mich 517, 518; 620 NW2d 844 (2001), the very thing he today says is constitutionally forbidden. In that matter, Judge

and Moore are equally deserving of a six-month sanction.

[16] Pursuant to Const 1963, art 6, § 30, the JTC has nine members, one Court of Appeals judge elected by the Court of Appeals judges, one circuit judge elected by the circuit judges, one probate judge elected by the probate judges, one district court judge elected by the district judges, three members elected by the state bar of whom one shall be a judge and two shall not be judges, and two members are appointed by the Governor who shall not be judges, retired judges or members of the state bar.

15

Runco was brought before this Court by the JTC with the recommendation being a censure. We affirmed. Justice Cavanagh, however, in dissent effectively asserted that the sanction be "modified" upward from a censure to thirty days. *Id.* at 524. A penalty, not to belabor the obvious, that was considerably more severe than that recommended by the JTC.

As to the dissent's analysis, after deconstructing the definition of the word "modify" to claim it only allows a downward departure (see n 9), it then urges that the language "[o]n recommendation of the judicial tenure commission" suggests that "[t]his Court's actions in judicial discipline cases that are not 'on recommendation' of the JTC are actions . . . not authorized by the constitution." Slip op pp 3-4. However, the dissent's argument is effectively undermined by its further insistence that an *increase* from the JTC's recommended discipline is *not* "on recommendation" of the JTC, but that a *decrease* from the JTC's recommended discipline *is* "on recommendation" of the JTC. We do not understand how the dissent can, consistent with the constitution, vote in support of a *decrease* in the discipline recommended by the JTC,[17] yet maintain that it is *un*constitutional for this Court to *increase* the JTC's recommended discipline.[18]

---

[17] See *In re Simmons*, 444 Mich 781; 513 NW2d 425 (1994). In *Simmons*, this Court rejected the commission's recommendation of a public censure and did not impose any punishment.

[18] The dissent's theory of what "on recommendation" means can only be described as a "ratchet construction"—one that proceeds in only one direction. The dissent urges that the *Mikesell* matter, in which this Court *rejected* the JTC's recommendation of permanent removal in favor of a time-limited suspension, was nonetheless a decision made "on recommendation" "because the more severe discipline, or more bases of misconduct, recommended by the JTC necessarily include *lower levels* of discipline and the bases of misconduct recommended, but not accepted." Slip op, p 5 n 1 (emphasis added).

Apart from the fact that this explanation has a certain impenetrable *Alice in Wonderland* logic about it, and leaving aside that judicial discipline jurisprudence recognizes no "lesser included offenses," the dissent's argument is internally inconsistent. If this Court *rejects* the JTC recommendation and interposes a lower level of discipline, the Court has not acted *on the recommendation* as the dissent contends. On the contrary, if the dissent's argument were truly consistent, then when, as in *Mikesell*, this Court rejects some of the bases for discipline the JTC relied upon, the Court would then be obligated to remand the case to the JTC for a new recommendation concerning the remaining acts of

Indeed, consistent with Justice Cavanagh's own voting record, we are convinced that the phrase "on recommendation" is an expression on how the judicial discipline process is *initiated.* Once the JTC makes a recommendation of discipline, this Court may accept or reject that recommendation. Inherent in our authority to reject a JTC recommendation is the option to decide the appropriate discipline to impose, whether it be an affirmance, a reduction, or an increase in the recommendation of the JTC.[19]

It is also noteworthy that the dissent has no response to the anomalous situation, identified in note 10, in which this Court would find itself if "modify" were interpreted only to refer to a downward change in sanction. We would be precluded in many instances from achieving both equivalence and proportionality in our sanctions, instead necessarily having to subordinate one or the other of these fundamental judicial values in favor of the other. In fact, the most that can be argued by one holding the position that no upward departure is constitutionally allowed—and it has been said by none other than Justice Cavanagh himself—is that increasing the recommended suspension has "never directly [been] addressed by this Court before" (except of course, in Justice Cavanagh's dissent in *Runco*). See *Hathaway*, 463 Mich 1201 (2000). This case presents a question of original impression, rather than as the dissent would characterize it, a departure from an unbroken line of cases for thirty-three years that have held contrary to today's majority. Only if "modify" is accorded the meaning adopted by the majority can this Court simultaneously achieve both of these indispensable ends.

Finally, we could not disagree more with the dissent that Judge Hathaway was not aware of the possibility that "the harshest discipline" she might face may go beyond that

---

misconduct. Neither the dissent nor this Court has interpreted the Const 1963, art 6, § 30(2) in this fashion and nothing in that provision compels such a construction.

[19] The dissent's position would also preclude this Court from being able to ensure fairness and proportionality across discipline cases. See footnote 10.

17

recommended by the JTC.  Slip op, p 15.  Judge Hathaway fully contested the charges at every level available to her at the JTC.  In this Court's July 26, 2000, order directing that this case be placed on the calender for oral argument and also directing the parties to address the sufficiency of the recommended discipline, Judge Hathaway was fully apprised that she might face an increased sanction from that recommended by the JTC.  See 463 Mich 1201 (2000).  Even in the dissenting statement prepared by Justice Cavanagh, when this matter was set for oral argument, Judge Hathaway was provided with further notice of the possibility that this Court might not believe a thirty-day suspension is justifiable and that increased sanctions might be forthcoming.  Here is what Justice Cavanagh said:

> I can only assume that implicit in this Court's order is the issue whether this Court has the authority to increase any discipline recommended by the Judicial Tenure Commission, an issue of great significance and one never directly addressed by this Court before.  463 Mich 1201 (2000). *Id*.

Indeed, Judge Hathaway's brief addressed the issue whether this Court had the authority to increase the recommended suspension and the issue was explored further when we heard oral argument.  We believe that there was no question that Judge Hathaway was aware of the potential for an increased sanction from that recommended by the JTC.

For these reasons, we do not agree with the dissent.

Pursuant to MCR 7.317(C)(3), the Clerk is directed to issue the judgment order forthwith.

CORRIGAN, C.J., and TAYLOR, YOUNG, and MARKMAN, JJ., concurred.

18

S T A T E   O F   M I C H I G A N

SUPREME COURT

IN RE HONORABLE CYNTHIA GRAY HATHAWAY,
     Judge of the Third Circuit Court,
     Detroit, Michigan.

No. 112495

_____

**WEAVER, J.** (*concurring*).

I concur in the result and the reasoning of parts I through IV of the majority opinion.

IN RE HONORABLE CYNTHIA GRAY HATHAWAY,
    Judge of the Third Circuit Court,
    Detroit, Michigan.

No. 112495

_____

CAVANAGH, J. (*dissenting*).

With its decision in this case, this Court departs from thirty-three years of precedent to assert that it has the constitutional authority to impose a level of discipline that exceeds the discipline recommended by the Judicial Tenure Commission. It does so in a matter that the JTC has twice considered and in which twice a unanimous JTC and the respondent Judge Hathaway have agreed on the appropriate level of discipline. I do not believe that this Court has the constitutional authority to increase the discipline recommended by the JTC and, accordingly, I must respectfully dissent.

I

As our deliberations in these cases have invariably demonstrated, our views of what is appropriate and "proportionate" discipline vary greatly. The final level of discipline imposed quite often is a negotiated level on which at least a majority of this Court can agree. I have no reason to doubt that the decisional process for the JTC works similarly. Any recommendation emanating from that body, more often an amalgam of its members opinions, is a subjective view. Because the JTC has the experience of dealing with these matters routinely, I have usually felt great reluctance in replacing the JTC's determination of an appropriate discipline with my own subjective view. On some occasions, I have joined this Court's rejection of recommended discipline as inadequate. See, e.g., *In re Griffin,* 448 NW2d 352 (1989). However, in each instance of this Court finding the recommended discipline inadequate, it has returned the matter

to the JTC for reconsideration and the possibility of a new recommendation. With its decision in this case, though, a majority of this Court rejects the JTC's twice-offered, unanimous recommendation, and sua sponte raises the level of discipline imposed. In doing so, it also raises the stakes and alters the historically understood dynamic in judicial discipline proceedings.

### A. THE SUPREME COURT'S AUTHORITY TO INCREASE DISCIPLINE

Before addressing the now-dynamited dynamic, though, I must address the majority's error in concluding that this Court even has the authority to increase the level of discipline recommended by the JTC. The JTC was created by the Michigan Constitution, and this Court's authority over judicial discipline is granted by that document as well. Our authority, however, is limited:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings. [Const 1963, art 6, § 30(2).]

The majority concludes that this provision gives this Court the authority to increase the level of discipline recommended by the JTC. It observes that this Court may "censure, suspend, with or without pay, retire or remove" a judge. See slip op at 11, quoting Const 1963, art 6, § 30(2). However, I cannot agree with that conclusion because it does not account for the common understanding of the constitution.

When interpreting constitutional provisions, this Court applies the rule of common understanding, first articulated by Justice COOLEY. Any such analysis is conspicuously absent from the majority opinion, but under this rule, we interpret the constitution to have the meaning most obvious to the common understanding, which is the meaning reasonable minds, the great mass of the people, would give it. See *Traverse City Sch Dist v Attorney Gen*, 384 Mich 390, 405; 185 NW2d 9 (1971).

2

The most obvious sense of the constitution is that this Court may impose the levels of discipline mentioned, but that it may only do so "[o]n recommendation of the judicial tenure commission . . . ." This phrase introduces this Court's power in judicial discipline cases, and conditions any exercise of this Court's authority on that exercise first having been recommended by the JTC. If the JTC has not recommended to this Court that the Court exercise its authority to impose a certain penalty, then any such exercise by definition cannot be "on recommendation" of the JTC. This Court's actions in judicial discipline cases that are not "on recommendation" of the JTC are actions in the first instance, and are not authorized by the constitution. Rather, they are an assertion of plenary power over judicial discipline cases.

This exercise of plenary power is contrary to this Court's demonstrated understanding of its proper role in judicial discipline cases. For example, *In re Mikesell,* 396 Mich 517; 243 NW2d 86 (1976), held that § 30(2) authorizes this Court to act in judicial discipline cases only on the JTC's recommendations. In *Mikesell,* the JTC filed a complaint against the respondent judge, alleging twelve instances of misconduct. However, only five of the twelve allegations survived the initial proceedings and were recommended to this Court as bases for discipline. One of the issues this Court had to decide was whether it could consider all twelve allegations, or only those five that survived the JTC's review. The Court concluded that the allegations upon which the JTC had not relied were "not part of the recommendation of the Commission and [would] not be considered by this Court." *Id.* at 526. Thus, *Mikesell* held that in judicial discipline cases, this Court is limited to acting on recommendation of the JTC, and matters beyond the JTC's recommendation are not to be considered by the Court.[1]

---

[1] Occasionally, this Court has deviated downward from both the JTC's recommendations on the bases of discipline and the level of discipline. In *Mikesell,* for example, the JTC alleged five bases of misconduct and recommended that the
(continued...)

3

Despite the Court being restricted to acting "on recommendation" of the JTC, a majority of this Court imposes discipline on respondent that is beyond the JTC's recommendation. The JTC recommended that respondent receive a thirty-day suspension, but the Court has gone well beyond that recommendation to impose a six-month suspension. Like the bases of discipline that were not recommended and could not be considered in *Mikesell,* the six-month suspension the Court imposes on respondent was not recommended to this Court, so this Court lacks the constitutional authorization to consider such discipline, let alone the authorization to impose it on respondent. If the Court is unhappy with the JTC's recommendation, it should follow our longstanding practice and remand the case to the JTC, rather than assert its own power to act beyond the JTC's recommendation.

Because the constitution limits this Court to the discipline recommended by the JTC, I also cannot agree with the majority's interpretation of MCR 9.225. That rule, which provides that this Court may "modify" the JTC's recommendations, must be read to conform to the Constitution. As we stated in *Grievance Admin v Underwood,* 462 Mich 188, 193; 612 NW2d 116 (2000), the court rules are interpreted under the principles of statutory construction, which require us to read the court rules in a manner that does not conflict

---

[1] (...continued)
respondent judge be removed from office. However, the Court accepted only three of the bases for discipline, and suspended the judge for one and a half years. See *Mikesell* at 520, 539; see also *In re Moore,* 464 Mich 98; ___NW2d __ (2001) (rejecting bases of misconduct and lowering the recommended discipline).

Although these cases represent variations from the JTC's recommendations, the Court's actions in them did not go beyond the JTC recommendations. For example, the JTC recommended removal in *Mikesell,* but the Court ordered a suspension. The suspension was "on recommendation" of the JTC because permanent removal certainly entails one and a half years off the bench. When the Court has ordered less severe discipline than the JTC has recommended, or has not accepted all the bases of misconduct, the Court nevertheless acts "on recommendation" of the JTC because the more severe discipline, or more bases of misconduct, recommended by the JTC necessarily include the lower levels of discipline and the bases of misconduct recommended, but not accepted. Thus, I disagree with the majority's conclusion that such an action would not be "on recommendation" of the JTC.

4

with the Constitution.  See *People v McLeod,* 407 Mich 632, 657; 288 NW2d 909 (1980).  Thus, the court rule's provision that we may "modify" the JTC's recommendations can only mean that this Court may modify them as long as it stays within the recommendations.  It cannot mean that this Court may "modify" a recommendation to do something that the JTC has not recommended in the first place.  Doing so is not modifying a recommendation for action, but is taking a greater action despite the recommendation.  Such a meaning and the actions pursuant to it, conflict with the constitutional requirement that this Court can only act "on recommendation" of the JTC.[2]

The majority seems to understand me to first "deconstruct" and "torture" the term "modify," and then urge

---

[2]  Notably, the majority cites a definition of "modify" that allows it to "alter" the recommendation, and asserts that its authority to increase discipline is "clear."  Slip op at 12-13.  Even aside from the constitutional problems with the majority position, the Court's understanding of the term "modify" is not so "clear."  Rather, "modify" is defined to mean to alter something by making it less extreme, severe, or strong.  For example, *The American Heritage Dictionary* (2d College ed), p 806-807, defines "modify" to mean:

> 1.  To change in form or character; alter.  2. *To make less extreme, severe, or strong.*  3. . . . To qualify or limit the meaning of. . .  4. . . . . To change (a vowel) by umlaut . . . To be or become modified.  [Emphasis added.]

Similarly, *Webster's New International Dictionary of the English Language* (2d ed, unabridged), p 1577, indicates that "modify" means to change by lessening:

> 1.  To *limit*; also, to *mitigate*, assuage, *Obs.* 2.  *To reduce in extent or degree; to moderate; qualify; lower; as, to modify* heat, *pain, punishment.* (*He modifies his first severe decree. Dryden.*)  3.  To differentiate into, or diversify by, different forms, as light, sound, passion; – now merged in sense 4.  4.  To change somewhat the form or qualities of; to alter somewhat; as, to modify the terms of a contract.  5.  *Gram.*  To limit or restrict the meaning of; to qualify.  6. *Philol.*  To change by umlaut.  7.  *Philos.*  To determine the, or a particular, mode of.  8.  *Scots Law.*  To award a decree as something to be done or paid.  –, *Intrans.:*  To undergo or make a modification; change.  [Emphasis added.]

The majority is correct that these dictionaries include the definitions they choose.  See slip op at 12, n 9.  Nevertheless, I offer these definitions of "modify" to illustrate the different understandings of the term, in contrast with the majority's convenient citation of only the definition that supports its conclusion. With these different understandings of "modify," I can hardly agree that the majority conclusion is "clear."  See slip op at 13.

5

that the constitutional language "on recommendation" conditions this Court's power in judicial discipline cases. See slip op at 22. This understanding is quite backward. As explained above, the "on recommendation" language from art 6, § 30(2) limits this Court's power. Because of that limit, we must interpret the term "modify" consistent with the constitution, which means interpreting it to mean that this Court cannot exceed the JTC recommendations in imposing discipline. If interpreting a term in the court rules consistent with the constitution is a "tortured" reading of the term, then this Court must be the Torquemada of text, because we interpret such terms as consistent with the constitution as frequently as necessary because it is our duty. See *McLeod, supra* at 657; see also Singer, 2A Statutes & Statutory Construction (6th ed), § 45.11, pp 70-71. If adhering to this canon of construction is torturing a word, then we all must be prepared to occasionally inflict forty lashes.

Beyond this, I find perplexing the majority's other pontifications on restricting the term "modify" to conform to the constitutional requirements. See slip op at 13, n 10. The majority sees no indication that the term "modify" only allows the Court to operate within the JTC's recommendations, but that indication is the constitution, which restricts this Court to the JTC recommendations. Further, the majority suggests that, absent the expansive understanding of "modify," which is only possible once the constitutional limitation that this Court may act only on the JTC's recommendation is discarded, this Court would be unable to review JTC decisions, and would not operate under the "rule of law." For thirty-three years, however, this Court has successfully reviewed JTC actions, and has issued written opinions and judgments in accord with its review without exercising the power to sua sponte increase the discipline imposed on respondent judges. During that time, rather than act in the first instance, if our review of JTC decisions had left us dissatisfied, we indicated that the proposed discipline was inappropriate and

6

remanded such decisions to the JTC for further consideration. See, e.g., *In re Griffin; In re Lawrence,* 419 Mich 1212 (1984). Our practice of conforming to the constitutional language and remanding to the JTC in no way hindered our ability to review JTC decisions. In carrying out our review, we simply gave the JTC an opportunity to come to a satisfactory decision before this Court reviewed the matter again. Because this Court's longstanding practice fully effectuated its duty to review JTC decisions, the majority's apparent conclusion that for the past thirty-three years, this Court and the JTC have been operating outside of the rule of law is at best hyperbole, and disrespects this Court itself.

Overstated as well are the majority's protestations that my position is contrary to the central organizing principle of constitutional government. The majority asserts that under my view, the JTC is not accountable to any elected body, and that the JTC, therefore, could act inappropriately and no elected body could do a thing about it. See slip op at 21-22. These assertions are simply not true. Under my view, the JTC remains accountable to this Court, which is in turn accountable to the people of Michigan. JTC recommendations must be approved by this Court, and if we think the recommended discipline is not sufficient, we can direct the JTC to consider the matter further. Thus, if the JTC acts inappropriately, we can do a thing about it, the same thing we have done for years. For those years, and under the constitutional condition that our actions must be "on recommendation" of the JTC, accountability has not been a problem, and continuing as we have been is in no way a threat to our constitutional order.[3]

Thus, I cannot agree that this Court may impose greater discipline on respondent than the JTC recommended because the constitution only allows this Court to take those actions that

---

[3] I find it ironic indeed that the majority invokes the constitutionally safeguarded referendum power as a tool of electoral accountability, yet in *MUCC v Secretary of State,* 464 Mich ___ ; ___ NW2d ___ (2001), it subverts the accountability provided by that power.

7

the JTC has recommended. Rather than imposing a harsher sanction itself, if the Court believes that the JTC's recommended discipline is insufficient, it should remand the case to the JTC to formulate a more severe sanction, as we have done in the past. In the instant case, though, such a remand would be odd, because respondent had agreed to accept the JTC's recommendation, and did not petition this Court to modify that recommendation. Cases like the instant case illustrate that the majority's misreading of the constitution will cause unfortunate consequences in judicial discipline proceedings.

B. The Negative Consequences of Sua Sponte Increasing Discipline

By departing from the constitutional restriction that this Court must act only on recommendation by the JTC, the decision in this case will set in motion unfortunate consequences in judicial discipline cases. It is important in this case that respondent has not petitioned this Court to modify the JTC's recommended discipline. Rather, she indicated her willingness to accept the thirty-day suspension the JTC recommended. In fact, respondent only became "adverse" to the JTC in this Court when this Court declined to adopt the recommendation and ordered the parties to argue whether the thirty-day suspension was appropriate, inherently ordering them to address this Court's authority to sua sponte increase discipline beyond the JTC's recommendation. See 463 Mich 1201 (2000). Thus, the dispute over how this Court may "modify" the JTC's recommendations comes not at respondent's urging, and not at the JTC's either, which recommended the thirty-day suspension, but only upon the majority of this Court's own interest in deciding a question that the parties had not actually presented.

In any event, previously, when a judge consented to the JTC's recommended discipline and did not petition this Court to modify the JTC's recommendation, this Court has entered the recommended discipline. See, e.g., *In re Waterman,* 461 Mich 1207 (1999); *In re Milhouse,* 461 Mich 1279 (2000). However, after this decision, respondent judges would be well advised

8

to consent to nothing and run the entire gauntlet of available proceedings because whatever the discipline recommended by the JTC, this Court is lurking at the end of the line to increase that discipline if it so chooses. A respondent judge's consent, then, would be futile, as this Court may turn a recommended censure into a suspension, or a suspension into removal, regardless of the respondent judge's willingness to acknowledge an ethical breach and submit to the discipline the expert body, the JTC, has recommended.

Instead of relying on the JTC's expertise, though, the majority has decided that this Court would do better to take these matters into its own hands. The benefits of a negotiated and relatively amicable resolution between the JTC and the respondent judge, avoiding the hearings and attendant publicity that contested allegations entail, and thus avoiding unnecessarily promoting the appearance of impropriety guarded against by Canon 2A of the Code of Judicial Conduct, are lost when judges must contest every case or be subject to a sanction that, before this Court issues the final word in a discipline case, is unforeseen. Also lost are the benefits of a judge acknowledging before the JTC and the public that he has done wrong and voluntarily is taking steps to correct the problem. Instead, the new practice of increasing discipline beyond the JTC recommendations encourages respondent judges to fight alleged misconduct to the bitter end because the final sanction that might be imposed in the end would be unknown until this Court imposed it, when it would be too late for a respondent judge to have any input or review of that sanction.[4] Even if the Court's decision did not contravene the constitution, I would not be able to join a decision that encourages such practices.

---

[4] The majority discusses respondent's notice that she faced an increase in discipline, see slip op at 25-26, but nevertheless both she, as well as future respondent judges, would not know, beyond the possibility of removal, what the upper limit of their discipline will be until it is upon them. In curious contrast, a convicted felon is at least informed of the upper limit of the possible sentence for his crime.

## C. THE *RUNCO* DISSENT

Oscar Wilde once wrote that "[c]onsistency is the last refuge of the unimaginative."[5] If Wilde was correct, then the majority is apparently attempting to flatter me by complimenting my imaginativeness when it asserts that my dissent from *In re Runco*, 463 Mich 517; 620 NW2d 844 (2001), is not consistent with my view in the instant dissent. However, I must decline this compliment because my *Runco* dissent is not inconsistent with my present position, as the majority claims.

In *Runco,* this Court entered the discipline recommended by the JTC. I did not agree with the recommendation, thinking it was insufficient and preferring the JTC minority position. See *id.* at 524. As a constitutional matter, before my preferred discipline could have been imposed, the appropriate action would have been for the Court to have remanded to the JTC for further consideration, as we have done in the past. See, e.g., *Griffin, supra.* However, because six members of this Court did not agree with me, the Court adopted the recommendation and the case was resolved. The final decision was made, and no remand was considered. Thus, because this Court was unanimous in concluding that respondent *Runco* deserved some level of discipline, and because the case was going to be resolved, my dissent simply stated the discipline that I believed would have been appropriate for the JTC to recommend. For me to have stated that I would have remanded would have been futile; instead, I went on record with my substantive position. My *Runco* dissent, then, is consistent with the instant dissent, and I am not so imaginative as the majority seems to believe.

Quite imaginative, however, is the majority's idea that my voting habits are relevant to our disagreement over the meaning of art 6, § 30(2). Though the majority and I may dispute the meaning of that constitutional provision, as

---

[5] *The Relation of Dress to Art, quoted in* Flesch, ed, *The New Book of Unusual Quotations* (New York: Harper & Row, 1966), p 62.

explained, my *Runco* dissent has no effect on this case, so to suggest that my voting habits are hypocritical advances nothing.

## II

For the reasons stated, I respectfully dissent from the majority opinion. By misreading the constitution, the majority transforms our judicial discipline system into a system that encourages members of the state judiciary to contest allegations of misconduct and leaves judges in the precarious position of not knowing the upper limit of their potential discipline before that discipline becomes final and irrevocable, except that they may be removed from the bench. I do not believe that the great mass of the people who ratified the constitutional language creating our judicial discipline system intended the system to so operate. Rather, the Michigan Constitution provides for a system that encourages judges to acknowledge and resolve their ethical mistakes. Also, our system allows those judges that do contest their alleged misconduct to arrive at this Court, before it makes a final decision, knowing that the harshest discipline they face is the discipline recommended by the JTC, and knowing that if the recommendation does not suit this Court, it will remand the case to allow the JTC and the respondent judge an opportunity to reach an alternate solution, or at least to allow the respondent judge to know what he faces before this Court makes a final decision. I would remain true to this constitutional design, and therefore I would either accept the JTC's recommended discipline or reject the recommendation and remand the case to the JTC for further consideration.

KELLY, J., concurred with CAVANAGH, J.

11